[Cite as *State v. Roan*, 2020-Ohio-5179.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

     Plaintiff-Appellee,          :

                                  No. 108917

     v.                                  :

KELLY ROAN,                             :

     Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 5, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-629154-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Schnatter and Theodore E. Parran, III, Assistant Prosecuting Attorneys, *for appellee.*

Friedman & Nemecek, L.L.C., and Eric C. Nemecek, *for appellant.*

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant, Kelly Roan, ("Roan") appeals from his convictions on three counts of rape. For the reasons that follow we reverse and remand for a new trial.

{¶ 2} In 2018, Roan was charged with four counts of rape. The matter proceeded to a trial by jury at which the following evidence was presented.

{¶ 3} Roan and C.H. were coworkers at University Hospitals and had known each other professionally for a few years. Roan had his medical license and was employed as a resident. C.H. was employed as a nursing assistant. On December 15, 2017, Roan and C.H. separately attended a holiday party at a colleague's apartment. At the party, they consumed alcohol and played drinking games together. According to Roan, they flirted, including tickling that other witnesses described as "playful wrestling" with Roan on the floor and C.H. on top of him, and dancing or "grinding" on one another. Roan testified he drank six beers and took a couple shots at the party. C.H. testified she drank enough to be drunk but did not black out.

{¶ 4} When the party ended in the early morning hours of December 16, 2017, Roan and C.H. went back to Roan's apartment. Roan and C.H. watched television on the couch and began "making out." According to Roan, C.H. told him she wanted to go upstairs to where his bedroom was located. C.H. testified she was fully clothed, wrapped herself in a blanket, and immediately went to sleep. Roan testified that he took his clothes off and they began making out. He tried to take

C.H.'s pants off and she told him "No. Stop," so he stopped. Roan testified they both fell asleep and did not wake up until later that morning.

{¶ 5} According to C.H., she woke up in the middle of the night on her stomach. C.H. testified she was now "completely naked" and Roan was on top of her penetrating her from behind. Throughout the entire investigation, pre- and post-indictment, and pretrial processes up until C.H. testified at trial, the allegation was that Roan penetrated C.H.'s anus by force or threat of force. C.H. testified at trial, however, that he penetrated her vagina, not her anus.

{¶ 6} C.H. testified that after this occurred she went back to sleep and woke up again around 11 a.m. She laid in Roan's bed for two hours until Roan woke up. When Roan woke up, they began kissing and touching. Roan penetrated C.H.'s vagina with his finger. She performed oral sex on him. Later, she asked him to drive her home and gave him her phone number.

{¶ 7} C.H. texted Roan the next day, asking him if he remembered what happened at his apartment. Roan replied that they "didn't do anything." C.H. responded "that's only because I woke up. I woke up very early in the [morning] to you trying to have sex * * *." Roan again replied that "nothing actually happened."

{¶ 8} Over the next two weeks, C.H. entered into a "voluntary outpatient rehab program." On January 1, 2018, C.H. went to the Cleveland Police Department and filed a report about the incident. Subsequently, she met with Detective Brian Kellums ("Detective Kellums") who investigated C.H.'s allegations.

**{¶ 9}** On August 28, 2018, Roan was charged with four counts of rape, all felonies of the first degree: one count of rape in violation of R.C. 2907.02(A)(1)(c) and three counts of rape in violation of R.C. 2907.02(A)(2), alleging anal penetration, digital penetration, and fellatio. As mentioned, Roan's case proceeded to a jury trial. Pursuant to Crim.R. 29, the court dismissed Count 3 — the R.C. 2907.02(A)(2) rape count that involved fellatio — and the jury found Roan guilty of the remaining three rape charges.

**{¶ 10}** The court sentenced Roan to the minimum term of three years in prison.

**{¶ 11}** It is from these convictions that Roan now appeals, raising the following assignments of error for our review; further facts will be discussed under the assignments of error:

> I. The state failed to introduce sufficient evidence to sustain the convictions in violati[on] of Dr. Roan's constitutional right to due process of law as guaranteed by Article I, Section 10 of the Ohio Constitution as well as the Fourteenth Amendment to the United States Constitution.
>
> II. Dr. Roan's convictions are against the manifest weight of the evidence.
>
> III. The trial court erred by allowing the state to elicit improper testimony in violation of the Ohio Rules of Evidence and Rules of Criminal Procedure, thereby depriving Dr. Roan of his constitutional right to due process of law and a fair trial as guaranteed by Article I, Section 10 of the Ohio Constitution as well as the Fourteenth Amendment to the Unites States Constitution.
>
> IV. The trial court erred by failing to order that the transcripts of the grand jury proceedings be produced for inspection, disclosed to the defense and/or otherwise maintained as part of the record.

**Standards of Review — Sufficiency and Manifest Weight of the Evidence**

{¶ 12} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21, citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571. The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court, to determine whether, after construing all reasonable inferences in favor of the state, any reasonable trier of fact could find that the state presented evidence to prove each of the material elements of the offense beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, ¶ 17, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶ 13} A sufficiency analysis is different from that undertaken in determining whether a conviction is against the manifest weight of the evidence. *Thompkins* at paragraph two of the syllabus. In considering a manifest-weight claim, the appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 14} The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386. Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000). When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.* Additionally, in a case tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins* at 389, citing Ohio Constitution, Article IV, Section 3(B)(3).[1]

{¶ 15} As shown above, we employ a different standard of review when considering whether the state provided sufficient evidence to sustain a conviction

---

[1]Conversely, a unanimous appellate court is not required to reverse on the ground that there was insufficient evidence to sustain a conviction. *See Thompkins* at *id.*

than when determining whether the conviction is against the manifest weight of the evidence. In sum, a reviewing court can find that there is sufficient evidence to support a conviction but also conclude that the conviction was against the manifest weight of the evidence.

Sufficiency of the Evidence

{¶ 16} Roan was convicted in Count 1 of rape in violation of R.C. 2907.02(A)(1)(c), which states that:

> No person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offenders knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *.

{¶ 17} Additionally, Roan was convicted in Counts 2 and 4 of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 18} Counts 1 and 2 originally charged Roan with rape by anal penetration. After the state presented its case, the prosecutor motioned the court to amend the indictment to charge Roan with vaginal rape. The court granted the state's motion. Thus, in short, Count 1 charged Roan with vaginal rape while C.H. was substantially impaired, Count 2 charged Roan with vaginal rape by force or threat of force, and Count 4 charged Roan with rape by digital penetration (Count 3, fellatio, was dismissed pursuant to Crim.R. 29).

{¶ 19} On appeal, Roan argues that the state "failed to present sufficient evidence of penetration as alleged in Counts 1 and 2 of the Indictment." Roan further argues that the state failed to present sufficient evidence that Roan "purposefully compelled C.H. to engage in sexual conduct (i.e., digital penetration) through the use of force or the threat of force" as charged in Count 4 of the indictment. The state contends that "there is ample evidence to support a rational trier of fact's decision that penetration occurred."

{¶ 20} In *State v. Falkenstein*, 8th Dist. Cuyahoga No. 83316, 2004-Ohio 2561, ¶ 16, this court held that "evidence of slight penetration, entering the vulva or labia, is sufficient to support a rape conviction." The *Falkenstein* Court further held that "there was sufficient evidence that could lead a rational trier of fact to conclude that appellant penetrated the victim by placing his penis on the outside of the victim's vagina." *Id.*

{¶ 21} C.H. testified that she was asleep and woke up to Roan penetrating her with his penis while lying on top of her. Ohio courts have consistently held that a victim's testimony alone is sufficient to support a rape conviction. *State v. Blankenship*, 8th Dist. Cuyahoga No. 77900, 2001 Ohio App. LEXIS 5520, 11 (Dec. 13, 2001). "[T]estimony, if believed, is sufficient to prove each element of the offense of rape. There is no requirement that a rape victim's testimony be corroborated precedent to conviction." (Citation omitted.) *Id.* Furthermore, this court has held that "sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct."

*State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 21.  Thus, C.H.'s testimony alone can provide sufficient evidence of substantial impairment rape pursuant to R.C. 2907.02(A)(1)(c).  While Roan's testimony contradicts C.H.'s testimony that this event occurred, when reviewing whether a conviction is supported by sufficient evidence, we look to whether the state presented sufficient evidence, not whether that evidence was rebutted by the defense.  Thus, upon review of the state's evidence, namely C.H.'s testimony that Roan penetrated her vagina while she was sleeping, we find sufficient evidence to convict Roan of substantial impairment rape in violation of R.C. 2907.02(A)(1)(c).

{¶ 22} Turning to the rapes in violation of R.C. 2907.02(A)(2), Roan argues that there was insufficient evidence of force or threat of force.  Force is defined in R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 23} C.H. testified that she "was describing [Roan] forcing his penis inside me" when she woke up the first time.  According to C.H., she pushed Roan off of her and jumped out of bed.  As to the next count of rape, C.H. testified that Roan digitally penetrated her vagina. According to C.H., she did not move other than to "try to squeeze my legs closed and cross them." C.H. testified as follows about what happened next:

> But he does — his fingers do go inside of me. * * * At that point, I kind of realized the only way that this is going to end and I can go home is if he gets what he wants at that point, because then I realized he's completely naked. * * * I was just still, and I was trying to cross my legs and hope that the body language would make him realize that this isn't

what I want. * * * I just remember just wanting to leave, just being — wiggling and just uncomfortable.

**{¶ 24}** Ohio courts have held that force may be established when the victim testifies that she resisted the defendant during the rape. *See State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, ¶ 48; *State v. Miller*, 9th Dist. Summit No. 27048, 2015-Ohio-279, ¶ 37.

**{¶ 25}** Additionally, this court has held the following regarding forcible rape: "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

**{¶ 26}** Here, viewing the evidence in a light most favorable to the prosecution, C.H.'s testimony was sufficient to support Roan's convictions for rape, and his first assigned error is overruled.

## Manifest Weight of the Evidence

**{¶ 27}** It bears repeating that although there may be legally sufficient evidence to support a judgment, we may still find that it is against the manifest weight of the evidence. After a thorough review of the record, we find merit to this assignment of error.

**{¶ 28}** On appeal, Roan argues that "the multiple inconsistencies and pervasive credibility issues plaguing C.H.'s testimony renders the trier of fact's decision against the manifest weight of the evidence." Specifically, Roan argues

that C.H.'s trial testimony that Roan raped her vaginally is inconsistent with C.H.'s informing law enforcement that Roan "penetrated — or, at least attempted to penetrate — her anus * * *." Roan also argues that evidence introduced at trial regarding C.H.'s actions and conduct during the time period at issue in this case are inconsistent with someone alleging nonconsensual sex. According to Roan, the "inconsistencies and contradictions throughout the trial of this case are sufficient to undermine confidence in the outcome."

{¶ 29} C.H. testified that she worked a 12-hour shift on the day of the party. According to C.H., she drank enough alcohol that she "was drunk," but she did not black out, and remembered "the party very well." Roan testified that he and C.H. were flirting at the party and did not kiss until they were back at his apartment. Although C.H. denied she was flirting with Roan, multiple witnesses confirmed his account. When the party broke up in the early morning hours, Roan invited C.H. and another coworker to his apartment to "keep on drinking."[2]

{¶ 30} Once at his apartment, Roan and C.H. sat on the couch and began to "make out." According to both Roan and C.H., the kissing was mutually initiated. C.H. testified that after about 15 minutes she told Roan that she was tired and wanted to go upstairs to sleep. Roan testified C.H. told him she wanted to go upstairs to his bedroom so when they got upstairs he got completely undressed because he thought they were going to "go further." C.H. testified that "I'm pretty

---

[2]Ultimately, the coworker decided not to go to Roan's apartment.

sure as soon as my head hit the pillow, I fell asleep." To the contrary, Roan testified they were both very much awake, laying side to side, and began kissing. He testified as follows about what happened next:

> Eventually, I thought we were going TO that next step and I started to remove her pants, at which point she told me "No." * * * I stopped. * * * I went to bed. * * * I woke up.

{¶ 31} Roan denied he was ever on top of C.H. in the middle of the night, took off her clothes or pulled down her leggings, or penetrated her with his penis.

{¶ 32} C.H. alleged that she fell asleep with all of her clothes on and wrapped herself up in an electric blanket but woke up "completely naked" on her stomach to Roan penetrating her vagina with his penis. She pushed him off, jumped out of bed, got back into the bed, and fell back asleep. She testified that she could have left but decided not to: "I was scared. I didn't know what to do," even though she had her phone with her and had used Uber earlier in the evening. When asked if Roan did anything to make her think she could not leave, C.H. answered, "No."

{¶ 33} C.H. testified that after the first assault she went back to sleep and woke up sometime around 11:00 a.m. Roan was still sleeping and C.H. stayed in the bed until he woke up two hours later. When asked, C.H. said she did not try to leave or use her phone. Roan testified that when he woke up,

> C.H. was still there. We started talking, just making small talk. We laid in bed for two and a half hours or so talking. * * * we talked about work. We talked about [how] she has pet rats, it was brought up, and she was showing me photos of them on her phone.
>
> * * *

After laying there for a bit, we began kissing again, and that lasted maybe three minutes or so, at which point she then removed the covers and started performing oral sex on me.

\* \* \*

So while she was performing oral sex on me, I put my fingers in her vagina.

{¶ 34} C.H. admitted the oral sex was consensual; she stated that the quickest way to "satisfy" Roan so she could leave was to perform oral sex on him.

{¶ 35} Asked if he forced himself upon C.H., Roan answered, "Absolutely not." According to Roan, C.H. took her own leggings off in the morning saying she was warm, and she never crossed her legs or resisted him in any way.

{¶ 36} C.H. asked Roan for a ride home. As they were getting ready to leave his apartment, Roan asked C.H. for her cell phone number and she gave it to him. About two hours after Roan dropped C.H. off, he texted her and they conversed about him going to the gym. Later that evening, C.H. initiated a text conversation by texting Roan a picture of a fast food beverage cup, joking that it was better than going to the gym. The next evening C.H. called Roan, but he did not answer the call. Instead, he texted C.H. C.H. told Roan she wanted to talk about what happened "the other night and if you remember." Roan replied: "I do barely remember that, but nothing actually happened. I'm sorry, I was wasted, and I know that's not a good 'excuse.' We can still talk if you want." When asked what he meant by his reply, Roan testified that he was apologizing for his attempt to take off her pants when they first went up to his bedroom.

**{¶ 37}** Roan eventually called C.H.: "I discussed with her that, you know, we were kissing, making out. I thought we were going to take that next step and go further and I tried to remove your pants and you said no, and that was the end of it." Roan testified that C.H. did not dispute any of this, and he thought they were on good terms. He told her they should get together and get some drinks or dinner. Roan testified that he first heard about C.H.'s allegations over ten months later, in September 2018, when he was indicted with four counts of rape. Up until the actual trial began, it was his understanding that C.H. accused him of trying to "penetrate her anus." The first time he heard an allegation of vaginal penetration was when C.H. testified at trial, almost a year and a half after the alleged assault occurred. With respect to Counts 1 and 2, C.H. never informed law enforcement or the prosecutor's office that the alleged incident involved vaginal penetration; rather, as evidenced by the recorded interviews and the indictment, C.H. consistently maintained that Roan penetrated — or attempted to penetrate — her anus:

> Defense Counsel: And you have never — just so I'm clear, you never told Detective Kellums, "vagina," correct?
>
> C.H.: Yes.
>
> Defense Counsel: You never told that first officer "vagina," either, did you?
>
> C.H.: No.
>
> Defense Counsel: So the first time we heard that from you, we, collectively, is here today, correct?
>
> C.H.: Yes.
>
> * * *

Defense Counsel: And I'm going to ask you, [C.H.], to read out loud the parentheses I have from line 3 through line 5.

C.H.: "And the next thing I remember is being woken up with, like, this sharp pain on my backside, my butt area."

Defense Counsel: And you can agree with me that nowhere on this page does it say "vagina," correct?

C.H.: Correct.

Defense Counsel: And nowhere in that audio did you hear that, did you?

C.H.: Correct.

{¶ 38} Detective Kellums confirmed that the first time he heard C.H. claim vaginal penetration was during her trial testimony. Asked if C.H. told him that she was vaginally raped, Detective Kellums replied, "No, she never used those words. * * * She never used the word 'vagina.'" Detective Kellums testified that based on C.H.'s allegations that she awoke to a pain in her backside, he believed she was describing anal sex. In his report, the detective used the word "anus."

{¶ 39} C.H.'s testimony regarding the second alleged incidence of sexual assault, which formed the basis for Count 4, is likewise problematic. C.H. maintained that she woke up before Roan and did not know what to do. She testified that she did not want to engage in sexual conduct after waking up that morning, but that testimony is inconsistent with her actions and related testimony, including her admission that she was voluntarily kissing Roan while he was digitally penetrating her vagina and that she ultimately decided to perform oral sex on him, asked him to drive her home after the assault, gave him her cell phone number

before she left his apartment, and continued to engage in text conversations with him.

{¶ 40} Specifically, Roan testified that when they woke up they talked for an hour or so in bed before kissing again and then C.H. took her clothes off, stating she was warm, and performed oral sex on Roan. While C.H. was performing oral sex on Roan, he testified he put his fingers in her vagina.[3]

{¶ 41} Following the alleged assault, C.H. continued to communicate with Roan, including exchanging multiple text messages. During these text exchanges, Roan denied anything inappropriate occurred at his apartment; C.H. did not dispute his account.

{¶ 42} In addition, C.H. initially denied speaking with Roan over the phone after the alleged assault but had to revise her statement when confronted on cross-examination with cell phone records confirming the call. Roan testified that during that phone call he discussed the night with C.H. and she did not dispute that he stopped when she told him "no."

{¶ 43} Likewise, although C.H. initially testified that she entered alcohol treatment because of the sexual assault, she later admitted — after being confronted with transcripts of her interviews with Detective Kellums — that she decided to enter the program prior to the date of the alleged assault due to a family history of

---

[3]Again, the trial court granted defense counsel's motion for a directed verdict on Count 3, the rape count involving fellatio, but the jury convicted Roan of Count 4, the rape count involving digital penetration.

alcohol abuse and an incident where she drove drunk. Finally, C.H. admitted that her decision to report the alleged assault to the police was prompted by seeing pictures of Roan at a different party that were posted to social media.

{¶ 44} C.H.'s explanation of what occurred in the middle of the night, which was that Roan penetrated or tried to penetrate her anus, but changed to penetration of her vagina during C.H.'s trial testimony, lacks credibility. While C.H. testified that she was asleep, fully clothed and wrapped in a blanket, but awoke "completely naked" to Roan raping her, she also testified that she repeatedly continued to engage in very intimate consensual sexual activity with him. *See State v. Schmidt*, 8th Dist. Cuyahoga No. 88772, 2007-Ohio-4439, ¶ 46 (finding insufficient evidence to convict the defendant of sexual battery).

{¶ 45} While we recognize that this is a sensitive issue, upon review, we find that this is the exceptional case where the evidence weighs heavily against the conviction; thus, Roan's convictions are against the manifest weight of the evidence.

{¶ 46} Roan's second assigned error is sustained. However, as we previously mentioned, an unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required in order to reverse a judgment on the weight of the evidence, when that judgment is the result of a jury trial. *Thompkins*, 78 Ohio St.3d at 389, 678 N.E.2d 541. Because our decision to reverse based on the weight of the evidence is not unanimous, Roan's conviction is not reversed based on this assignment of error.

## Expert Testimony

{¶ 47} In the third assignment of error, Roan argues that the trial court erred when it allowed the state to elicit improper testimony from Detective Kellums with regard to C.H.'s disclosure of the alleged rapes.

{¶ 48} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage,* 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Lay witness opinion testimony is "limited to those opinions which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Evid.R. 701.

{¶ 49} Evid.R. 702, on the other hand, governs expert witness testimony, and it states, in pertinent part, as follows:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 50} Roan also alleges a violation of Crim.R. 16(K), which states as follows:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 51} Roan argues that Detective Kellums's testimony about C.H.'s delayed reporting of the rape was improperly admitted at trial because it was an expert opinion and the detective was not qualified as an expert witness nor did the state submit a written report pursuant to Crim.R. 16(K). Roan further argues that Detective Kellums's "testimony had the practical effect of improperly bolstering the veracity of C.H.'s allegations by opining that her actions were in line with individuals who were victims of sexual assault."

{¶ 52} Roan's counsel objected to the admission of Detective Kellums's testimony; therefore, this court reviews for harmless error — "'a standard significantly more favorable to the defendant.'" *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, quoting *United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir.2003). Under the harmless-error-standard, the state bears the burden of showing that "the error did not affect the substantial rights of the defendant." (Citation omitted.) *Perry* at *id.*

{¶ 53} In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, the Ohio Supreme Court characterized the harmless error rule as a way "to forgive technical mistakes" and set out a three-part analysis to determine the effect

(if any) of the error: (1) "[T]here must be prejudice to the defendant as a result of the admission of the improper evidence at trial"; (2) "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt," i.e., that there was "no reasonable possibility that the testimony contributed to the accused's conviction"; and (3) "in determining whether * * * the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 24, 27-29. As to the third prong, the court suggested that harmless error cases involve "'overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.'" *Id.* at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5.

{¶ 54} The *Morris* Court emphasized that the proper focus of the inquiry is "'not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony upon the jury.'" *Morris* at *id.*, quoting *Rahman* at *id.*, fn. 4. In other words, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at ¶ 33.

{¶ 55} Detective Kellums testified that at the time of trial he had been a police officer for over ten years and a detective in the sex crimes unit for over two years. He had worked on over 200 sexual assault cases and had received special training in the investigation of sexual assaults. He further testified:

Prosecutor:  Now in your personal experience in terms of a victim of a sexual assault reporting the sexual assault, have you experienced an array of times between immediate reporting versus delayed?

Detective Kellums:  Yes, sir.  Often, it's years before disclosures are made.

* * *

Prosecutor:  You mentioned it can be from immediate disclosure to years?

Detective Kellums:  Yes, sir.

Prosecutor:  Have you spoken with victims of sexual assault that have not reported it immediately?

Detective Kellums:  Yes, sir.

Prosecutor:  Have you learned reasons that cause people to delay in reporting sexual assaults?

* * *

Detective Kellums:  Often the victims will express to me * * * fear.

Prosecutor:  Fear of what?

Detective Kellums:  Fear of coming forward for various reasons; shame, sometimes it's just the trauma of the event.  They don't know how to process it right away.

Prosecutor:  Did you have a conversation with [C.H.] about the delay in her reporting what occurred between Kelly Roan and her in his apartment and her reporting to the [police]?

Detective Kellums:  I did.

Prosecutor:  And what were some of the — did you learn from [C.H.] what caused that delay in her?

* * *

Detective Kellums:  Yes.

Prosecutor: Were the reasons that [C.H.] articulated to you that caused her delay consistent with things that you have heard from other victims of sexual assaults?

Detective Kellums: Yes.

{¶ 56} On redirect, the state elicited additional testimony from the detective:

Prosecutor: Did you locate the text messages of a conversation between Kelly Roan and [C.H.]?

Detective Kellums: Yes, sir.

Prosecutor: Those text messages, are they consistent with what [C.H.] explained to you happened inside of Kelly Roan's apartment that night?

Detective Kellums: Yes, sir.

Prosecutor: In fact, it confirms that Kelly Roan never denied anything that [C.H.] had said?

Detective Kellums: Yes, sir.

Defense Counsel: Objection.

Court: Overruled.

{¶ 57} It is undisputed that the state never sought to have Detective Kellums qualified as an expert witness nor did the state provide an expert report pursuant to Crim.R. 16(K). Under the circumstances of this case, we find that the trial court admitted Detective Kellums's testimony in error.

{¶ 58} Detective Kellums gave improper opinion testimony regarding the consistency of statements C.H. and Roan made to him when compared to their text messages. Detective Kellums essentially opined that C.H. was a credible witness

because her story was consistent and Roan was not a credible witness because he "never denied anything that [C.H.] said" in her text messages. It was within the province of the jury as the trier of fact to make a credibility determination, a role the detective impermissibly usurped. We find that the trial court committed error by allowing this testimony to reach the jury, and accordingly we must consider whether the error was harmless.

{¶ 59} In determining whether Roan suffered prejudice by the admission of the testimony, we note that the state presented Detective Kellums as its investigating detective, highlighting the detective's career with the Cleveland Police Department and the amount of sexual abuse cases he had handled.

{¶ 60} Turning to the second part of the analysis, we cannot say that this error was harmless beyond a reasonable doubt or that there was no reasonable possibility that the testimony contributed to Roan's conviction. This case involved a credibility battle without independent corroborating evidence of sexual assault. We find that Detective Kellums's testimony improperly bolstered C.H.'s testimony, thereby impermissibly tipping the scales towards a guilty verdict.

{¶ 61} Finally, under the third part of the analysis, we have already determined that the manifest weight of the evidence does not support Roan's convictions for rape. This is not a case where the evidence of guilt was strong or we have confidence that the error did not impact the outcome.

**{¶ 62}** In light of the above, the third assignment of error is sustained. Roan's convictions are reversed and the case is remanded based on our sustaining the third assignment of error.

### Grand Jury Transcripts

**{¶ 63}** "In Ohio, the long-standing tradition of grand jury secrecy is well pronounced in case law." *State v. Greer*, 66 Ohio St.2d 139, 146, 420 N.E.2d 982 (1981). Pursuant to Crim.R. 6(E), grand jury transcripts may be disclosed "when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

**{¶ 64}** The Ohio Supreme Court has further held that "if the defendant is able to demonstrate a particularized need, i.e., where the surrounding circumstances indicate a probability that the failure to disclose the grand jury testimony will deprive the defendant of a fair trial, grand jury proceedings may be disclosed." *State v. Lawson*, 64 Ohio St.3d, 336, 345, 595 N.E.2d 902 (1992). "The question of whether a particularized need exists is within the discretion of the trial court." *State v. Grewell*, 45 Ohio St.3d 4, 9, 543 N.E.2d 93 (1989).

**{¶ 65}** Roan argues that there is a "particularized need" for these transcripts because "C.H.'s testimony that the allegations underlying counts 1 and 2 of the indictment concerned vaginal — as opposed to anal — penetration." According to Roan, the indictment, police reports, and "discussions, frankly, have

centered around the idea that [C.H.] was anally raped." But at trial, C.H. testified that Roan vaginally raped her. Roan argues that defense "[c]ounsel was undoubtedly surprised and prejudiced by the disclosure, and the court's failure to order production of the transcripts — or at least conduct an in camera review of the materials — constituted an abuse of discretion sufficient to warrant a reversal of the convictions."

{¶ 66} Based on our resolution of the second and third assignments of error, we find this assignment of error to be moot. *See* App.R. 12(A)(1)(c). Upon retrial, defense counsel may certainly motion for release of the grand jury transcripts and the court can determine whether disclosure is warranted pursuant to Crim.R. 6(E).

{¶ 67} Judgment reversed based on the third assignment of error; case remanded for proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

ANITA LASTER MAYS, J., CONCURS:
PATRICIA ANN BLACKMON, P.J., DISSENTS
WITH SEPARATE DISSENTING OPINION

PATRICIA ANN BLACKMON, P.J., DISSENTING:

{¶ 68} I respectfully dissent from the majority's opinion in this case. Rather, I would affirm the jury convicting Dr. Roan of rape. In my opinion, this is not the exceptional case in which the evidence weighs heavily against the convictions.

{¶ 69} First, the issue regarding whether C.H. was raped vaginally or anally appears to be a misunderstanding rather than an inconsistency. Asked if C.H. told him that she was vaginally raped, Detective Kellums replied, "No, she never used those words. * * * She never used the word 'vagina.'" Detective Kellums testified that, based on C.H.'s allegations that she awoke to a pain in her backside, he believed she was describing anal sex. In his report, the detective used the word "anus." After hearing C.H.'s testimony that Dr. Roan had penetrated her vagina from behind with his penis while she was sleeping, Detective Kellums testified that he was mistaken in his belief that C.H. was describing anal sex when she reported the rape.

{¶ 70} I would find that C.H.'s use of the word "backside" when she reported the incident to the police is not necessarily inconsistent with her trial testimony accusing Dr. Roan of vaginal rape. When C.H. woke up, she was lying on her stomach, and Dr. Roan was on top of her penetrating her from behind. She described a pain in her backside because that is where the assault was coming from. There is no evidence that C.H. specifically told Detective Kellums that Dr. Roan penetrated her anally. This is not a case where the victim expressly alleged anal rape to the police and then changed her story to allege vaginal rape at trial. Given these circumstances, C.H.'s trial testimony regarding vaginal rape is not unbelievable or incredible.

{¶ 71} Second, in my opinion, the court did not err by admitting Detective Kellums's testimony about C.H.'s delayed reporting of the rape. The incident occurred on December 16, 2017, and C.H. reported it to the police 16 days later on January 1, 2018. This short delay happened during the Christmas season, and C.H. testified that she went into an alcohol-related rehabilitation program during this time. While at rehab, she disclosed what happened with Dr. Roan in a group therapy session. According to C.H., "through that process, I realized that the best decision would be to go to the police and do the right thing and speak up and say something." C.H. reported the crimes on the first day of the New Year.

{¶ 72} In *State v. McKee*, 91 Ohio St.3d 292, 296-297, 744 N.E.2d 737 (2001), the Ohio Supreme Court recognized:

It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

{¶ 73} In *State v. Mathis*, 8th Dist. Cuyahoga No. 107365, 2019-Ohio-3654, this court reviewed and found admissible testimony from a social worker "about the manner in which sexually abused children disclose the nature of their abuse based on her experience with such cases." *Id.* at ¶ 61. The *Mathis* Court concluded that the social worker's

"opinion that it is 'pretty common' for sexually abused children to disclose the abuse in a 'long-term disclosure' was based on her firsthand experience of over 22 years and approximately 2,000 cases. * * * Moreover, her opinion here was helpful to determination of a fact at issue in this case, namely, whether Mathis assaulted the victim in the manner she described despite the inconsistency between her initial and subsequent statements.

We note that in no point in her testimony did the social worker offer an opinion about whether the victim was telling the truth, nor did she offer an opinion about whether Mathis was the perpetrator.

*Id.* at ¶ 63-64.

{¶ 74} Detective Kellums testified that he had worked on over 200 sexual assault cases and had received special training in the investigation of sexual assaults. His testimony did not offer an opinion as to the veracity of C.H.'s

allegations, other than to say, in his experience, her reasons for the delayed disclosure were consistent with other delayed disclosure cases.

{¶ 75} This court has held that "[w]itness credibility becomes the most important issue in [a] he-said-she-said rape case." *State v. McSwain*, 8th Dist. Cuyahoga No. 105451, 2017-Ohio-8489, ¶ 37. The pivotal issue here is consent, and that turns on whether the jury believed C.H.'s or Dr. Roan's testimony. The jury found that Dr. Roan used force to penetrate C.H. with his penis while she was sleeping and with his fingers while she was awake. I believe we must be mindful that witness credibility and the weight of the evidence are primarily matters for the trier of fact to consider. *State v. DeHaas*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶ 76} Accordingly, I would not disturb the jury's verdict in this case.