[Cite as *State v. Cooper*, 2025-Ohio-2007.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 114411 |
| v. | : | |
| JAVON COOPER, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 5, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682549-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Steven Szelagiewicz and Michael Wajda, Assistant Prosecuting Attorneys, *for appellee.*

Goldberg Dowell & Associates and Michael J. Goldberg, and Adam Parker, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Javon Cooper ("Cooper") appeals his conviction for rape in violation of R.C. 2907.02(A)(1)(b). For the following reasons, we affirm the trial court's judgment.

## I.   Facts and Procedural History

{¶ 2} In 2019, Cooper was living with K.C. ("Mother") and her two children, L.P. and D.V., on W. 139th Street in Cleveland.  L.P. was 12 years old at the time. Cooper and Mother's relationship ended in July 2019 and Mother, L.P. and D.V. moved out of the house.  In June 2020, L.P. disclosed to Mother via text messages that Cooper had raped her in the summer of 2019.  Mother notified the police of the abuse but, at the time, L.P. was not ready to talk about it.  In January 2022, L.P.'s allegations were referred to the Cuyahoga County Department of Children and Family Services ("CCDCFS") and a sexual abuse investigator interviewed L.P.

{¶ 3} On July 10, 2023, Cooper was indicted for four counts of gross sexual imposition, one count of importuning and one count of rape of a child under 13 years old.  According to Cooper's indictment, these offenses occurred between June 1, 2019 and July 31, 2019.

{¶ 4} On September 17, 2024, this case proceeded to a jury trial.  On September 19, 2024, the jury found Cooper guilty of rape as indicted.  On September 26, 2024, the court sentenced Cooper to "a minimum term of twenty-five years and a maximum of life imprisonment."

{¶ 5} Cooper appeals and assigns the following errors for our review:

I.  The trial court erred in allowing a sexual abuse examiner to offer opinion testimony on behavior of child abuse victims under Evid.R. 701.

II.  The trial court erred in allowing Detective Sparks' testimony about delayed disclosure.

III. The trial court erred in allowing a witness to opine on the child victim's veracity.

IV. Appellant's conviction is not supported by sufficient evidence.

V. There was insufficient evidence to support a furthermore finding that appellant used force.

VI. Appellant's conviction was against the manifest weight of the evidence.

## II. Trial Testimony

### a. Chanelle Childers

{¶ 6} Chanelle Childers ("Childers"), a trauma therapist for children at MetroHealth, testified that she used to work as a sexual abuse investigator at CCDCFS. According to Childers, the "main" responsibility as an investigator "is just to ensure the child's safety, make sure [t]hat they no longer have access to the alleged perpetrators, that we know no further abuse could possibly occur, and then refer for any mental health services, physical health services afterwards if it's necessary."

{¶ 7} Childers testified that she has a master's degree in social work, she is a licensed social worker and she has been trained to be a sexual abuse investigator. According to Childers, her training included "how to recognize abuse in children; how to speak with the different parties of a case; how to ask open-ended questions, different policies, different laws."

{¶ 8} Childers testified about a referral that she was assigned in January 2022. This referral was a non-emergency case because the alleged perpetrator did not still have access to the child victim. Childers immediately made "first contact" with the child, L.P. and assessed for safety and the need for immediate medical and

therapy services. Childers testified that the next step was to set up a forensic interview with L.P. where the main goals were to "[a]ssess safety, make sure there's still no access, and then refer for mental health services, or if a medical exam is needed." Childers further testified that forensic interviews are recorded, "[t]here's an observer in a second room, and you're basically just asking open-ended questions, trying to get as many details as possible out of the child while making sure that they feel comfortable and safe, and they don't feel pressured."

{¶ 9} The State asked Childers how children "typically disclose physical or sexual abuse" and the following colloquy took place:

> A: Um, it really just depends on the child. I've seen a range of crying, no emotion, being angry, being scared that they think they're in trouble for something.
>
> Depending on the age and cognitive level of the child, they may use like correct terminology for body parts, or if we have drawings, they might just point to it if they don't want to, like, say the physical word out loud, or sometimes they may not talk at first in the beginning of the interview.
>
> They may sit there for an hour, hour-and-a-half, and then after they're like very comfortable in the moment, then they may disclose. It all just depends.
>
> Q: Okay. And if the child does eventually disclose physical or sexual abuse, does it usually happen right at the time of said physical or sexual abuse?
>
> . . .
>
> A: No. It can be whenever.
>
> Q: Okay. When — if you know, do you know why?
>
> . . .

A:  Um, so, of course, it all depends on the child, but some of the reasons that I've come across is they may not think that they're going to see the alleged perpetrator again, so they think, Oh, want it done and not going to bring it up, and then they may see them, and, you know, they don't want to be around them, so they kind of feel like they have to disclose.

They could feel a little bit of embarrassment or shame about it, or I mean, it's usually just confusing for a child.  They love this person, but they just don't love what they did to them.

Q:  And in your experience can this disclosure be traumatic for the child?

A:  Absolutely.

. . .

Q:  Based on your experience in children, who do children disclose to?

. . .

A:  They can disclose to anyone, whoever they feel most comfortable and safe with.

Q:  Okay.  And have you ever, during your 100 forensic interviews, investigated abuse inside the home?

A:  Yes.

Q:  And does that change how a child can disclose?

A:  Like I said, usually in the past, it makes it a little bit harder for them to want to talk about it, because they feel — well, I don't want to say how they might feel, but just an extra level of what this might do to our family, so I don't want to talk about it.

{¶ 10} Childers testified that she conducted a forensic interview with L.P. on January 26, 2022, during which L.P. disclosed "a few times" that there was "inappropriate sexualized touching and that she was raped anally."  According to Childers, "[t]he first thing [L.P.] said was that she was raped."  Childers testified that, later in the interview, L.P. disclosed the identity of the "perpetrator" as L.P.'s

"mom's boyfriend," Cooper. Childers further testified that L.P. said the rape happened "in the summertime . . . when she was 12" years old.

{¶ 11} Childers testified that L.P. disclosed various incidents when Cooper inappropriately touched her, asked her if she watched pornography and asked her for oral sex. L.P. further disclosed to Childers the details of the rape as follows:

> Um, she said that . . . Cooper told her to go in the bedroom. She saw him lock the door behind him after she was inside.
>
> She said that he then pulled out a basket from a nightstand or something, and she saw him remove condoms and a bottle of what looked like lotion. She said that . . ., when I was interviewing her, she knew to be lubrication, but at the time she didn't know what it was.
>
> She then said that he got on the bed with her and spread what felt like jelly on her butthole, and then she said that he inserted his penis into her butthole and was going in and out. She said that it was painful.
>
> She was asking him to stop, and he — he made a remark, You're doing so good, Princess. She said that when he stopped, she felt liquid inside of her butthole, and she went to the bathroom, and it felt like she was peeing out of her butt.

{¶ 12} Childers testified that she referred L.P. "for mental health services" after the forensic interview and then closed her case.

{¶ 13} On cross-examination, Childers testified that she met with Cleveland police detective Richard Sparks ("Sparks") before L.P.'s forensic interview and Sparks told Childers the "questions he was hoping [Childers] would ask . . . ." According to Childers, Sparks observed L.P.'s interview. Asked if, at some point during the interview, Sparks gave her "some ideas for other questions to ask," Childers answered, "Probably, yes."

{¶ 14} On redirect-examination, Childers was asked if it is "common for children to disclose based on your experience" during other investigations. Childers answered that it was not common, explaining as follows: "A lot of times, especially with sexual abuse, if they're not asked somewhat directly, then they won't bring it up. Levels of shame, embarrassment, fear."

**b. L.P.**

{¶ 15} L.P. testified that she was born in December 2006. She was 17 years old at the time of Cooper's trial. L.P. testified that she used to live on W. 139th Street in Cleveland with Mother, her brother and Cooper. At one point, Cooper moved out when he and Mother "split up" but he returned. According to L.P., Cooper lived with her family for approximately three years. When asked about her relationship with Cooper, L.P. replied, "He was my stepfather." Asked how did the relationship "go," L.P. answered, "It was — he was abusive." L.P. testified that her relationship with Cooper was "pretty normal at first, besides the abuse . . . . He was a father figure to me."

{¶ 16} According to L.P., the dynamics changed "the last four months of the relationship, three months of the relationship. . . . Started when Cooper asked me if I wanted to watch porn with him." L.P. testified that this happened when she was 12 years old. "I know it happened in the summer of the year I was about — I was leaving sixth grade, going into seventh." L.P. told Cooper, "No" and she did not watch pornography with him. L.P. testified that Cooper began making comments to

her, such as "I thought you weren't wearing any pants," and he asked for a hug then grabbed her "butt."

{¶ 17} L.P. testified about an incident when Cooper took her to get "pads" after she started her menstrual period and "he kept putting his hand on [her] thigh in the car." L.P. and Cooper went into CVS together and L.P. purchased the pads. According to L.P., when they "came back out . . . Cooper asked me to suck his penis." Asked what happened, L.P. answered, "I did it." L.P. testified that she "[j]ust wanted it to be over." According to L.P., this happened in the "back of his truck . . . [p]arked in [the] CVS parking lot." L.P. testified that she did not tell anybody what happened at that time.

{¶ 18} L.P. testified about another incident that occurred in July 2019 at Cedar Point. L.P., her mother, her brother and Cooper were in line for a water slide that was "high up" and while they were on the stairs, Cooper "kept grabbing" her "butt from behind."

{¶ 19} Asked if there were any other incidents that she remembered, L.P. said, "Cooper raped me" in July 2019. According to L.P., her brother was upstairs in his bedroom and Mother was at nursing school one "early morning." L.P. was in her bed sleeping when Cooper woke her up and told her to "go downstairs and get undressed." L.P. went downstairs and sat on the couch. According to L.P., Cooper "reiterated" that she "needed to get undressed." L.P. "did what he told me to do." L.P. and Cooper went into Mother's bedroom and Cooper told L.P. to lay on her stomach. L.P. did as Cooper instructed. L.P. testified that Cooper got a "tube" of

something that "looks like lotion, but clear" from the shelf and put "a cold substance on [her] butthole." According to L.P., she did not know what the substance was at the time, but she was "more educated" now. L.P. testified in detail how Cooper anally raped her. According to L.P., it was "[p]ainful."

{¶ 20} Asked if Cooper "was saying anything while he was doing this," L.P. answered, "Yes. He kept telling me it's going to be okay, Princess, because I was crying." Asked why she was crying, L.P. stated, "Because I didn't want that, and it hurt." According to L.P., Cooper stopped after he ejaculated. Asked how she knew this, L.P. replied, "Because. . . when he was done, I went to the bathroom. I sat down, and I felt it come out of my anus."

{¶ 21} L.P. testified that she did not tell anyone what happened because she "was scared" of Cooper "finding out I told someone." According to L.P., she, her mother and her brother moved out of the house they shared with Cooper "less than a month" after this occurred. Subsequently, Cooper called L.P. "a couple of times, and he picked me up one time." Asked if she and Cooper ever talked "about what happened," L.P. stated that "he asked me if I wanted to do it again."

{¶ 22} L.P. testified that the first person she talked to about the sexual abuse was Mother. The State introduced into evidence several copies of text messages between L.P. and Mother. On June 18, 2020, L.P. texted Mother as follows:

> L.P.: I've been trying to build up the confidence to say this to your face but it's just not going to happen any time soon, and PLEASE don't blame this on yourself, it's not your fault, but cooper did something really bad to [m]e.

Mother: Ok just say it. We'll be strong together.

L.P.: He didn't keep his private areas to himself.

Mother: What?! Like rape?

L.P.: Yes but not in my private part in my butt.

{¶ 23} L.P. testified that "[a]voidance" was the reason it took her "so long" to tell Mother and eventually she "[d]idn't want to keep it a secret any more." According to L.P., she did not tell Mother the details at that time because she "had a hard time talking about it. . . ." L.P. testified that she has "been to counseling" and her "confidence is just different now" so she is able to talk about the sexual abuse.

{¶ 24} On September 3, 2020, L.P. sent a detailed text message to Mother describing how Cooper anally raped her. The details of this text are substantially similar to the details of L.P.'s statement to Childers and her testimony at Cooper's trial. L.P. testified that she "had a hard time talking about it in person" and she "didn't want to look [her] mom in the face."

{¶ 25} L.P. said that Mother talked to an investigator about the sexual abuse but L.P. did not "go forward" with talking to the police at the time because she was not "ready." Eventually, L.P. spoke with "a lady" at the Rape Crisis Center in a room that "looked like a kid's playroom almost." L.P. testified that she did not recall the name of the lady with whom she spoke and she did not recall the date of the interview.

{¶ 26} On cross-examination, L.P. testified that she did not remember an occasion in the summer of 2019 when she talked to a social worker concerning a

fight Mother and L.P.'s father had regarding visitation. Specifically, defense counsel asked L.P. if she recalled telling the social worker that she felt "safe" at the time. L.P. answered, "I don't recall speaking to a social worker." L.P. further testified that in 2019, she was engaged in family and individual therapy and admitted that she did not disclose to her therapist "anything" about Cooper.

{¶ 27} L.P. agreed that approximately two-and-a-half years passed between the time of the abuse and the first time she spoke to a social worker or investigator about it. Defense counsel asked L.P. if her earlier trial testimony was the first time she reported to anyone about the "oral sex coming home from CVS . . . ." L.P. answered, "Sure. I don't know." L.P. also testified that she did not report the abuse to her doctor when she got a "checkup" every year. According to L.P., Cooper never told her to not tell anyone about the abuse.

{¶ 28} On redirect-examination, L.P. testified that she did not tell her first therapist about the abuse because Cooper "was still around" at the time. According to L.P., she was scared that Cooper would find out that she disclosed the abuse while "he was still in the home that [she] stayed in." L.P. also testified that she did not tell the first social workers or her doctor because she did not "want to get taken from [her] mom."

### c. Monica Flake

{¶ 29} Monica Flake ("Flake") testified that she is L.P.'s paternal grandmother. Flake testified that another one of her granddaughters told her that L.P. "said her stepfather raped her from the back." Flake called L.P. "to find out was

it true . . . ." According to Flake, L.P. was "crying and broke down and scared" at the time.

### d. Mother

{¶ 30} Mother testified that in 2019, she, her children and Cooper lived on W. 139th Street in Cleveland. In July 2019, Mother and her children moved out and Cooper stayed in the house. In June 2020, L.P. "confessed" to Mother "what happened" via text message. At the time, Mother was in the living room and L.P. was in the bathroom. Mother identified a copy of the text messages between her and L.P. in which L.P. told her "that something bad had happened with her private." Either that day or the next day, Mother "made a police report and reported it to Child Services and reported it to her counselor."

{¶ 31} According to Mother, they did not "proceed with the case" any further at this point, because L.P. "was not ready to even speak it out of her mouth, and at that point text messaging was the only way that she was able to come forward with anything like this . . . ." Mother testified that L.P. sent her another text message detailing what happened. Mother further testified that L.P. still is "very uncomfortable" talking about what happened. Asked if she had noticed changes in L.P. over the last few years, Mother answered, "Tremendously. She went from a super active student athlete, always smiling, laughing, hilarious, positive [to] someone that can be easily triggered, misunderstood by so many people because she is triggered and cries and spats, and she's never, ever been that person, never before."

{¶ 32} According to Mother, when she and Cooper ended their relationship, "he would still interact with the kids here and there." L.P. and Cooper were particularly close. This lasted "a couple months."

{¶ 33} On cross-examination, Mother testified about an incident that occurred in "early June" 2019 where L.P.'s father would not return L.P. to Mother after his visitation. Mother and Cooper went to pick L.P. up and Flake punched Mother in the face. CCDCFS initiated an investigation on June 6, 2019, in which a caseworker from CCDCFS spoke with L.P. on that date and, again, on July 18, 2019.

{¶ 34} Mother testified that her family and Cooper were in "private counseling" starting early in 2019. According to Mother, "[e]veryone had their own counselor." L.P. was in counseling when she sent the text message to Mother about Cooper raping her. According to Mother, she reported the abuse to the police and CCDCFS, but L.P. "didn't do the interview with the Detective right away," because L.P. "wasn't ready." L.P. remained in therapy at the time. "I believe she was seeing two different therapists. They were working on her being able to verbalize to say it out loud because she could barely even touch the subject of it."

{¶ 35} In January 2022, Mother took L.P. to the Child Advocacy Center ("CAC") for an interview.

### e. Richard Sparks

{¶ 36} Sparks testified that he is a detective with the Cleveland Police Department's Sex Crimes and Child Abuse Unit. Asked if victims usually disclose

abuse "right at the time of the abuse, or can that differ based on your cases," Sparks answered,

> It differs. . . . Well, it all depends on the victim, or whoever's involved in the case. If they want to speak, they want to speak. Sometime[s] it take[s] time. You know, victims go through things. I've had cases, just to reflect, that the victim doesn't come for like five years and gives their statement, you know. It all depends on the mindset of where they are and how they feel.

{¶ 37} When asked how the timing of a disclosure affects his investigation, Sparks testified that it does not change how he goes about his investigation, but it may affect the "evidence."

{¶ 38} On June 30, 2020, Sparks was assigned a case in which L.P. was the victim. Sparks made contact with Mother on July 1, 2020. Sparks testified as follows about what happened after he contacted Mother: "Well, I reached out because we wanted to interview the daughter to get an initial statement or a forensic interview, but that didn't happen immediately. . . because the victim was not ready at the time to move forward with the investigation." Sparks testified that he was never able to see, or speak to, L.P. regarding this case. He did, however, observe the forensic interview at the CAC on January 26, 2022.

{¶ 39} After L.P. disclosed the abuse, Sparks "started making contact with witnesses and things that, or whoever the victim spoke to." Sparks testified that he was able to identify Cooper as the suspect in this case.

{¶ 40} On cross-examination, Sparks testified that he was not aware CCDCFS was investigating L.P. and her family in June and July 2019 or that they

were "in the house of the alleged victim at the exact time that she's alleging a crime occurred." Asked if this would be relevant to his investigation, Sparks answered, "No."

{¶ 41} Sparks testified that it was "very common" for a person claiming sexual abuse to "hold off telling anyone they were abused." According to Sparks, this delay is because victims are "[s]cared. You're in fear. You don't know if your suspect — in this situation, the suspect still stays in the home with the victim, you know? It all depends on the situation. You have a 12-year-old child at the time of this, you know? And all she got is her mother, though?"

### f. Elizabeth Piechowiak

{¶ 42} Elizabeth Piechowiak ("Piechowiak") is a licensed independent social worker with a master's degree in social work and is a supervising therapist at Pathway Care for Children. Piechowiak provides the following types of therapy: "Trauma focus, kind of behavioral therapy, EMDR, which is eye movement desensitization and reprocessing, person-centered approaches solution focus techniques, trust base, develops interventions and other evidence best practices."

{¶ 43} According to Piechowiak, she became involved in L.P.'s case on June 15, 2021. L.P. "presented with some relationship strain between her and her dad, as well as presented with past trauma being some psychological abuse, some physical forms of punishment, as well as reporting a rape that had occurred." Piechowiak testified that she had "about 20-ish sessions" with L.P. that ran through

November 2022. Piechowiak testified that she diagnosed L.P. with post-traumatic stress disorder ["PTSD"] based on the following:

> It was evidenced by her experiencing a trauma, multiple traumas, as well as witnessing some physical abuse. Following the trauma that occurred she struggled to talk about it, which is one of the symptoms. She was experiencing flashbacks. She reported she was experiencing flashbacks about three times a month in the form of present-day flashbacks, as well as nightmares, and then she experienced some negative alterations in her thoughts and feelings. She struggled to trust others.
>
> She was more hypervigilant and had more sad and depressed mood. And those symptoms occurred for over a month. And it caused clinically significant distress in the home, school and community environment.

{¶ 44} On cross-examination, Piechowiak testified that L.P.'s "multiple traumas" included sexual assault, "abandonment and mistreatment by her biological father" and "[m]istreatment by her mother." According to Piechowiak, the sexual assault occurred in July 2019. Piechowiak testified that there "was some other assault" that L.P. suffered that had "nothing to do with anybody in her household."

### g. Javon Cooper

{¶ 45} Cooper testified on his own behalf at trial. Cooper stated that he is 36 years old and he works as a truck driver. According to Cooper, in the last ten years, he had an attempted felonious assault case in Cuyahoga County and the victim was not a household member. Cooper moved in with Mother and her two children "three to four months" after they met in 2018 and they lived on "139th off Lorain." According to Cooper, his relationship with Mother's two children was "[b]eing of

assistance to the mom as much as I could." Asked if he ever disciplined the children, Cooper answered, "Yes" and explained that this was with Mother's knowledge. Asked what kind of discipline, Cooper answered, "Whoopings." Cooper explained that this happened "[w]ith a belt or with punishment, as far as just restriction from activities." According to Cooper things such as "[l]ying to your mother" and "not being at school when you[r] supposed to be at school" was the "kind of bad behavior" that caused a "whooping."

{¶ 46} Cooper moved out of Mother's home in July 2019 when his relationship with Mother ended. Cooper testified that on June 3, 2019, a "brawl" occurred with him and L.P.'s father's family. Cooper testified as follows about this incident:

> [L.P.] went with her dad, their side of the family, and they did not want to return her because he didn't like the time that he had to bring her back. [Mother] didn't like that, so, you know, me playing my role — Let's go get her. And when we went to go and get her, they didn't want to let her go, so [Mother] ended up getting into a physical altercation with the grandmother and her boyfriend, and while she was maintaining that, I was handling [L.P.'s] father.
>
> . . .
>
> He came down the hall, pulled a gun on me. It didn't mean nothing to me. And I maintained him so [Mother] would be okay, and we left with [L.P.] that day.

{¶ 47} CCDCFS opened a case as a result of this incident and visited the home on W. 139th Street three days later. Cooper was present for this visit. According to Cooper, "they" talked to L.P. alone. CCDCFS came back around July 17, 2019, "after

receiving more allegations." Cooper spoke to "them" and L.P. spoke to "them" alone again.

{¶ 48} In June or July 2022, Cooper received "communication from a detective regarding the allegations" in this case. Cooper said the detective was named Sparks. At the time, Cooper was in Arizona and he told Sparks, "as soon as I get back to the yard in Cleveland, Ohio, I'll come and see him." Cooper was called into the Sex Crimes Unit of the Cleveland Police Department but he had no idea why. According to Cooper, Sparks told him there was DNA evidence against him, which Cooper later learned was not true. The following colloquy took place:

Q:    What was your answer when he said, Why did we find DNA on [L.P.]? What did you say?

A:    Not possible.

Q:    How many times did he ask you that?

A:    Five.

Q:    And every time you said what?

A:    I cut him off, and I said, Not possible.

. . .

Q:    And did you specifically say you never — well, what did you say to him about any allegations of touching [L.P.]?

A:    Not possible.

{¶ 49} Cooper was asked about each allegation that he touched L.P. inappropriately, including oral sex in the CVS parking lot, and Cooper answered that nothing had happened. Specifically, defense counsel asked Cooper, "Did anything

happen with regard to going into a bedroom alone with [L.P.]?" Cooper answered, "No." Asked if L.P. ever told Cooper "she was uncomfortable about anything" that was "done or said to her," Cooper answered, "No."

{¶ 50} Cooper testified that Mother learned that Cooper was having an affair with Mother's sister from January 2018 to June 2018. According to Cooper, Mother found this out after he was "already out of the house."

{¶ 51} On cross-examination, Cooper testified that he got along "fine" with L.P. and was a "father figure." He would discipline her for "lying" and "wetting the bed" and "wetting the couch" when she was 12 or 13 years old.

{¶ 52} Although Cooper testified that he "absolutely" recalled sitting on the couch with L.P. watching TV at times, he did not recall the specific incident about which L.P. testified where he asked her whether she was wearing pants. Asked if L.P. was "ever in [Mother's] bedroom with" him, Cooper answered, "No, sir." Cooper further testified that he could not think of any reason why L.P. "would come up with this."

## III.  Law and Analysis

### a.  Evid.R. 701 and Opinion Testimony

{¶ 53} Cooper's first three assignments of error concern the admissibility of "opinion" testimony at his trial. In his first assignment of error, Cooper argues that the trial court improperly allowed "Childers to testify on how and why children disclose abuse." In Cooper's second assignment of error, he argues that the trial court improperly allowed "Sparks to testify to reasons a victim in general might

delay disclosure, as well as his opinion as to why the specific victim in this case delayed." In his third assignment of error, Cooper argues that the trial court improperly allowed "Piechowiak to testify . . . that she had diagnosed L.P. with [PTSD]" and this "diagnosis is the functional equivalent of an opinion of the child's veracity."

{¶ 54} We review the admissibility of evidence for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 55} Evid.R. 701 governs opinion testimony by lay witnesses and it states as follows: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 56} Evid.R. 702 governs expert witness testimony and Cooper argues that this rule and cases that apply this rule are applicable to the testimony of Childers, Sparks and Piechowiak in this case. Our review of the record shows that the State did not offer these three people as expert witnesses, the court did not qualify these three people as expert witnesses and these three people did not testify as expert witnesses. Therefore, we limit our analysis to law concerning the opinion testimony of lay witnesses pursuant to Evid.R. 701.

{¶ 57} In *State v. McKee*, 91 Ohio St.3d 292, 295-295 (2001), the Ohio Supreme Court opined on lay witness opinion testimony and recognized "the importance of a foundation of sufficient familiarity with the substance to support the opinion." The *McKee* Court found that "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *Id.*

### i. Childers' Testimony

{¶ 58} Starting with Cooper's first assignment of error, we find that the court acted within its discretion when it allowed Childers to testify about delayed disclosures in rape cases.

{¶ 59} In *State v. Bright*, 2018-Ohio-3922 (8th Dist.), this court reviewed whether a sexual assault nurse examiner's ("SANE") testimony regarding delayed disclosures by sexual assault victims violated Evid.R. 701. The *Bright* Court summarized the SANE nurse's testimony as follows:

> In the instant case, the testimony was elicited from the examining SANE nurse who explained to the jury, based on her experience, that there are several reasons why a child may not want to disclose abuse, including fear that they may get in trouble, not having the words to describe what happened to them, lack of understanding that what happened was wrong, or fear of not being believed. She testified that children may not disclose for days, weeks, or months after the abuse happens. Lastly, she testified that children often disclose the least invasive act first, and once they feel safe sharing, disclose further information. This testimony was general in nature and not pertaining to [the victims] specifically.

> In addition, prior to this testimony, the SANE nurse detailed her education and credentials, including that she is the pediatric forensic program coordinator at University Hospitals Rainbow Babies and Children's Hospital; she has been trained as a SANE nurse for over 12

years; she has performed nearly 1,000 exams; and she has trained many nurses and physicians over the years on how to perform forensic sexual-assault exams.

*Id.* at ¶ 23-24. The court found that the SANE nurse's testimony was "permissible lay-witness testimony because the State laid a foundation demonstrating that the SANE nurse had sufficient experience and training, and that her testimony was based on her personal knowledge and experience." *Id.* at ¶ 25. *See also State v. Belle*, 2019-Ohio-787, ¶ 48 (8th Dist.) (holding that the SANE nurse's "testimony fell within the ambit of Evid.R. 701's requirement that the lay opinion be rationally based on firsthand observations and helpful in determining a fact in issue.").

{¶ 60} In *State v. Peterson*, 2024-Ohio-2903, ¶ 31 (8th Dist.), this court applied the law concerning a SANE nurse's testimony about delayed disclosures to social workers' testimony about delayed disclosures, stating as follows: "We have found that a trial court may allow a social worker to testify to the general manner in which children disclose sexual abuse so long as no opinion is offered as to the truth of the victim's statements." The *Peterson* Court found the testimony at issue to be proper under Evid.R. 701.

{¶ 61} Upon review, we find that Childers' testimony was based on her perceptions as a trained sexual abuse investigator. Childers testified as to what she has "seen" as part of her job and "some of the reasons" behind delayed disclosure she has "come across" as part of her job. The prosecutor's questions to Childers typically were prefaced with "[b]ased on your experience . . . ." Furthermore, we find that Childers' testimony was helpful to present a clear understanding of delayed

disclosures of sexual abuse and how they relate to the reporting victim's credibility. *See, e.g., State v. Jones,* 2015-Ohio-4116, ¶ 111 (2d Dist.) (finding the detective's "testimony was rationally based on his training and personal experience in child abuse cases and aided the trier of fact in determining [the victim's] credibility since her disclosure of the abuse was delayed and she had some difficulty with the timing of her abuse").

{¶ 62} Accordingly, Cooper's first assignment of error is overruled.

### ii. Sparks' Testimony

{¶ 63} As to Cooper's second assignment of error, we find that the court acted within its discretion when it allowed Sparks to testify as to delayed disclosures in general and L.P.'s delayed disclosure in this case. Sparks testified about his experience investigating sexual assaults and how it is common for victims to delay disclosing for various reasons. Ohio courts have held that this is permissible testimony under Evid.R. 701.

{¶ 64} In *State v. Bey*, 2025-Ohio-740, ¶ 32 (8th Dist.), this court found that a detective's testimony regarding delayed disclosure of a rape "was permissible lay-witness testimony because the State laid a foundation demonstrating that the detective had sufficient experience and training and her testimony was based on her personal knowledge and experience." *See also State v. Moore*, 2025-Ohio-712, ¶ 60 (3d Dist.) (finding that the court acted within its discretion when it allowed testimony from a special agent about delayed disclosures from rape victims because his "testimony concerning whether, in his experience, it is common for individuals

to delay reporting instances of sexual abuse was based on his own perceptions and experience, and it was helpful to the jury in the determination of a fact in issue").

{¶ 65} Accordingly, Cooper's second assignment of error is overruled.

### iii. Piechowiak's Testimony

{¶ 66} Turning to Cooper's third assignment of error, we find that the court acted within its discretion when it allowed Piechowiak to testify about diagnosing L.P. with PTSD because, contrary to Cooper's argument on appeal, Piechowiak did not testify to L.P.'s credibility.

{¶ 67} Cooper cites *State v. West,* 2008-Ohio-5249, ¶ 7 (8th Dist.), to support his argument under this assignment of error. In his appellate brief, Cooper argues that "[w]hen an expert offers a diagnosis, based on nothing more than the child's statements, the diagnosis is the functional equivalent of an opinion of the child's veracity." Cooper's argument is based on an overly broad interpretation of the case. The following is a procedural synopsis of *West*: "The facts of this case involve the detailed description of numerous alleged rapes perpetuated on a child by his cousin, appellant Terrell West, over a period of years. No medical or physical evidence was introduced at trial. However, the State did introduce the expert testimony of nurse-practitioner Lauren McAliley . . . ." During the nurse practitioner's testimony, the prosecutor asked her if she made an "ultimate diagnosis" regarding the victim. *Id.* at ¶ 2. The nurse practitioner answered as follows: "That there was a good likelihood that [the victim] had been sexually abused as he described and it should be investigated to the full extent possible." *Id.* This court reversed West's convictions

finding that "[i]t is more than harmless error to allow the expert witness to testify as to the veracity of a child victim's statements." *Id.* at ¶ 7.

{¶ 68} In this case, Piechowiak was asked if she was able to "provide a diagnosis" for L.P. Piechowiak answered that L.P. had PTSD and explained that this was "evidenced by [L.P.] experiencing a trauma, multiple traumas, as well as witnessing some physical abuse." During Piechowiak's testimony, she did not opine that there was a "good likelihood" that L.P. had been sexually abused. Furthermore, as stated earlier in this opinion, Piechowiak did not testify as an expert witness. Therefore, *West* is inapplicable to this case.

{¶ 69} In *State v. Heineman*, 2016-Ohio-3058 (8th Dist.), the defendant argued on appeal that the sexual abuse victim's treating psychologist, who testified as a lay witness, improperly gave opinion testimony at trial. *Id.* at ¶ 14. The doctor testified about the victim's "recollection of the alleged abuse by Heineman, including various times when the abuse 'escalated' and the concept of 'delayed reporting.'" *Id.* at ¶ 19. The doctor also testified that the victim's "'narrative history'" was consistent with the doctor's "'knowledge, experience and training on the subject of child sex abuse . . . .'" *Id.* at ¶ 21. This court found that the testimony was admissible because the doctor "did not expressly answer the ultimate question of whether, in her opinion, Heineman sexually abused [the victim] nor did she expressly testify as to [the victim's] truthfulness." *Id.* at ¶ 22. *See also Williams v. Reynolds Rd. Surgical Ctr.*, 2004-Ohio-1645 (6th Dist.) ("[C]ourts have used Evid.R. 701 to permit treating

physicians to render opinions based upon their personal observations and perceptions.").

{¶ 70} Accordingly, Cooper's third assignment of error is overruled.

### b. Sufficiency of the Evidence

{¶ 71} In Cooper's fourth and fifth assignments of error, he argues that there was insufficient evidence to support his rape conviction, including the furthermore clause that he "purposely compelled [L.P.] to submit by force or threat of force."

{¶ 72} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 73} "An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt." *State v. Balinski*, 2022-Ohio-3227, ¶ 43 (8th Dist.). *See also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) ("[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

### i. Rape of a Child

{¶ 74} The entirety of Cooper's argument under his fourth assignment of error follows:

> Here, there were no direct witnesses to the alleged offenses other than L.P. L.P.'s brother was at home at the time of the alleged rape, but apparently was unaware it had occurred. L.P. added a significant detail to her testimony – an incident where she performed oral sex on [Cooper], which had never been mentioned before, in any of her conversations with the prosecutor's office or investigator. Based on these facts, and inconsistencies, the Court should vacate . . . Cooper's conviction as against the sufficiency of the evidence.

{¶ 75} Cooper was convicted of rape in violation of R.C. 2907.02(A)(1)(b), which states that "[n]o person shall engage in sexual conduct with another when . . . [t]he other person is less than thirteen years of age . . . ." It is undisputed that sexual conduct includes anal intercourse pursuant to R.C. 2907.01(A), and it is undisputed that L.P., who was born in December 2006, was 12 years old in the summer of 2019.

{¶ 76} We first note that inconsistent testimony does not factor into an analysis of the sufficiency of the evidence. *See, e.g., Balinski*, 2022-Ohio-3227, at ¶ 56 ("A defendant is not entitled to reversal merely because certain aspects of a witness's testimony are inconsistent or contradictory."); *State v. Nichols*, 2013-Ohio-3898, ¶ 13 (5th Dist.) ("Challenges to the sufficiency of the evidence based upon instances of inconsistent testimony, memory defects, and the like are witness credibility issues which are properly resolved by the trier of fact.").

{¶ 77} Ohio courts consistently hold that rape convictions can be based on the victim's testimony alone and corroborating evidence is not needed. *Bey*, 2025-

Ohio-740, at ¶ 36; *State v. Blankenship,* 2001 Ohio App. LEXIS 5520 (8th Dist.); *State v. Roberts*, 2005-Ohio-6391, ¶ 67-68 (1st Dist.).

{¶ 78} Upon review, we find that L.P.'s testimony alone, which included an allegation that Cooper forced anal intercourse, is sufficient to establish the elements of rape in violation of R.C. 2907.02(A)(1)(b). Cooper's fourth assignment of error is overruled.

### ii. Force

{¶ 79} In his fifth assignment of error, Cooper argues that there was insufficient evidence of force. Cooper's rape conviction included a jury finding that he purposely compelled L.P. to submit by force. R.C. 2901.01(A) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 80} In *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988), the Ohio Supreme Court recognized the "coercion inherent in parental authority when a father sexually abuses his child." The *Eskridge* Court held that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that a rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. at 58-59. The Court further explained that the "force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly

equal in age, size and strength." *Id.* at ¶ 1 of the syllabus, citing *State v. Labus*, 102 Ohio St. 26, 38-39 (1921).

{¶ 81} In *State v. Dye*, 82 Ohio St.3d 323 (1998), the Ohio Supreme Court further developed the law concerning force when it applied *Eskridge* to a rape case in which the defendant was not the victim's parent, but he held a position of authority over the child. The *Dye* Court held that "a person in a position of authority over a child under thirteen may be convicted of rape of that child with force . . . without evidence of express threat of harm or evidence of significant physical restraint." *Id.* at 329.

{¶ 82} Additionally, R.C. 2907.02(C) states that a "victim need not prove physical resistance to the offender in prosecutions" for rape.

{¶ 83} In this case, Childers testified that L.P. saw Cooper "lock the door behind him after she was inside" Mother's bedroom. Childers also testified that L.P. told Cooper to stop when he was anally raping her. L.P. testified that Cooper was her "stepfather" and he was a "father figure" to her. L.P. further testified that when Cooper ordered her to go downstairs and get undressed, she "did what he told me to do." L.P. testified that she was crying when Cooper raped her because she "didn't want that, and it hurt." According to L.P., she did not tell anyone about the rape initially because she "was scared" of Cooper "finding out I told someone." The record is replete with testimony about why L.P. took two-and-a-half years to disclose the rape to a professional — namely, that she was traumatized and could not talk about what happened. Additionally, Mother testified that, at first, L.P. "was not

ready to even speak it out of her mouth" and L.P. changed "tremendously" after the abuse. Piechowiak testified about the mental trauma L.P. experienced as a result of Cooper raping her. And finally, Cooper testified that he was a "father figure" to L.P.

{¶ 84} This evidence is sufficient to show force, whether it be physical or "subtle and psychological" as referenced in *Eskridge*, 38 Ohio St.3d 56. Accordingly, Cooper's fifth assignment of error is overruled.

### c. Manifest Weight of the Evidence

{¶ 85} In Cooper's sixth assignment of error, he argues that his rape conviction was against the manifest weight of the evidence. Specifically, Cooper argues that because "L.P. admitted on cross examination [sic] that her trial testimony was the first time she had ever told anyone about the incident of oral sex," his conviction was against the manifest weight of the evidence.

{¶ 86} A manifest weight of the evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson,* 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-

3800, ¶ 17, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 87} In a manifest weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved only for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶ 88} Cooper supports his argument by citing this court's opinion in *State v. Roan*, 2020-Ohio-5179, ¶ 57-62 (8th Dist.), in which the defendant's convictions for three counts of rape were reversed based on improperly admitted testimony. In *Roan*, the majority also found that the defendant's convictions were against the manifest weight of the evidence, but because there was a dissenting opinion, this court was unable to reverse the convictions based on this finding. "[A]s we previously mentioned, [a] unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required in order to reverse a judgment on the weight of the evidence, when that judgment is the result of a jury trial." *Id.* at ¶ 46.

{¶ 89} The manifest weight finding in *Roan* was based on a conclusion that the victim lacked credibility because her disclosure to the police alleged anal rape,

but her trial testimony alleged vaginal rape. *Id.* at ¶ 44. Interestingly, the dissent in

*Roan* explained its position as follows:

> [T]he issue regarding whether [the victim] was raped vaginally or anally appears to be a misunderstanding rather than an inconsistency. . . . [The detective] testified that, based on [the victim's] allegations that she awoke to a pain in her backside, he believed she was describing anal sex. In his report, the detective used the word "anus." After hearing [the victim's] testimony that [the defendant] had penetrated her vagina from behind with his penis while she was sleeping, [the detective] testified that he was mistaken in his belief that [the victim] was describing anal sex when she reported the rape.

*Id.* at ¶ 69.

{¶ 90} Cooper argues that this case is similar to *Roan* in that "L.P.'s testimony included testimony about a specific sex act that had never been disclosed to law enforcement prior to trial. L.P. admitted on cross examination [sic] that her trial testimony was the first time she had ever told anyone about the incident of oral sex." According to Cooper, this "significant change in testimony" required a reversal of his conviction based on a manifest weight theory.

{¶ 91} Upon review, we find that this case can be distinguished from *Roan*, 2020-Ohio-5179 (8th Dist.). While it is true that L.P. disclosed new allegations of sexual abuse at Cooper's trial, the jury convicted him of one count of rape related to anal penetration and acquitted him of all other charges. L.P.'s statements regarding Cooper anally raping her when she was 12 years old never changed and they were always consistent. This is not the exceptional case in which the jury lost its way and the evidence weighs heavily against conviction.

{¶ 92} Accordingly, Cooper's sixth and final assignment of error is overruled.

**{¶ 93}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., and
ANITA LASTER MAYS, J., CONCUR