[Cite as *State v. Harris*, 2025-Ohio-4374.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

    Plaintiff-Appellee,              :

                                 No. 114710

    v.                                      :

TYRIEON HARRIS,                                 :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 18, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690400-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John T. Dowling, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Aaron T. Baker, Assistant Public Defender, *for appellant*.

DEENA R. CALABRESE, J.:

{¶ 1} On November 15, 2024, a Cuyahoga County jury found defendant-appellant Tyrieon Harris guilty of substantial impairment rape. The trial court entered judgment in accordance with the jury's verdict, imposing a prison term and

a fine of $5,000.  Harris timely appealed his conviction as well as the fine levied as part of his sentence.  Finding no merit to the appeal, we affirm the conviction and associated fine.

## I. Procedural History and Facts

{¶ 2} On March 21, 2024, the Cuyahoga County Grand Jury returned a one-count indictment charging Harris with substantial impairment rape in violation of R.C. 2907.02(A)(1)(c).  The case proceeded to trial beginning November 13, 2024.

{¶ 3} The victim, D.T., testified that in the first half of 2023, she and Harris began "flirting back and forth on Instagram" and "becoming familiar with each other." (Tr. 290-291.)[1]  As they got to know each other, however, and before meeting in person, D.T. realized that Harris "[ran] in the same friend group" as her daughter's father.  (Tr. 291-202.)  They communicated on Instagram for only a short time, after which D.T. told Harris she would proceed no further because it would be "weird."  (Tr. 291.)  According to D.T., Harris responded by saying he understood her reluctance to become further involved.  (Tr. 292.)  The State introduced screenshots of Instagram direct messages establishing the timeframe for these exchanges.  (State's exhibit No. 5.)

{¶ 4} D.T. and Harris did not communicate again until August 2023. (Tr. 298-300.)  During that Instagram direct messaging exchange, Harris wrote "you couldve had me," to which D.T. responded, "You cool, but the whole baby

---

[1] A bit later in her testimony, D.T. clarified that she was referring to the messaging function built into the Instagram application, which functions much like many other direct messaging platforms.  (Tr. 292-293.)

daddy thing. I feel like it's too close[.]" (Tr. 300 and State's exhibit No. 4.) Harris responded that D.T. did not have to "ghost" him and that they could have hung out. (Tr. 300.) D.T. told Harris he "had to get over [his] crush" on her because it "would've always made it semi awkward." (Tr. 302-303 and State's exhibit No. 5.)

{¶ 5} The evening of August 19, 2023, D.T. was still mourning the death of her younger brother, who was killed approximately two months earlier. (Tr. 303.) She decided to drive to her best friend's place of employment, Larry Flynt's Hustler Club, where alcohol was served and where she knew she could "get free drinks." (Tr. 304-306.) She "had a few drinks" of tequila with her friend and then left to visit her friend's sister. (Tr. 304 and 306.) The two went to D.T.'s older brother's house, where she consumed "like two shots" of tequila. (Tr. 304 and 306-307.)

{¶ 6} D.T. testified that she and Harris had been communicating over the course of the evening and that he had suggested the two of them "hang out." (Tr. 304.) Harris even suggested he meet D.T. at the strip club. (Tr. 308.) While they did not meet at that location, at one point, after D.T. had consumed alcohol at both the strip club and her brother's house, Harris asked her to "stop at a liquor store to get a bottle." (Tr. 304.) D.T. testified that she "informed him that [she] was too drunk to be driving." (Tr. 304.) D.T. "knew [she] was drunk at that point and driving to a liquor store by myself probably wouldn't have been the smartest idea at nighttime." (Tr. 305.) The State introduced a screenshot of an Instagram direct-message exchange that D.T. identified as relating to Harris's request that she go to a

specific liquor store. She responded, by direct message, "I'm not going alone[.] Too drunk[.]" (Tr. 309-310 and State's exhibit No. 6.)

{¶ 7} D.T. nevertheless drove to a bar after driving her friend's sister to another location. (Tr. 307.) She met Harris at the bar and consumed "at least . . . one drink" that she remembered. (Tr. 311.) D.T. recounted that she could not "really much remember" any conversation she had with Harris. (Tr. 311.) She did not recall any conversation about "being more than friends." (Tr. 311.) She denied kissing Harris at the bar, even on the cheek. (Tr. 311.)

{¶ 8} D.T. did not remember leaving the bar and, in fact, testified to remembering nothing after that point "until [she] woke up." (Tr. 312.) She testified that when she awoke, she was still wearing exactly the same clothing as when she visited the bar and other locations, including a long-sleeve shirt, a leather skirt, and stockings. (Tr. 312-313.) D.T.'s clothing was intact, except her "panties were half off and one of the legs were off on the stockings[.]" (Tr. 312 and 326-327.) Harris "was on top of [her]," and "[h]is penis was inside of [her] when [she] woke up." (Tr. 312-313.) Asked if Harris addressed her in any way when she woke up, D.T. testified that he said, "Sorry." (Tr. 313.) She testified that she "froze" and "felt sick and disgusted[.]" (Tr. 313.) She "felt like she had to throw up." (Tr. 313.)

{¶ 9} Harris told D.T. that he was about to ejaculate. D.T. asked him not to ejaculate inside her, testifying that "I didn't want him inside of me and I definitely didn't want him to cum inside of me either." (Tr. 313-314.) Harris withdrew and ejaculated externally, after which he went to the bathroom and D.T. dressed and left.

(Tr. 314.) D.T. drove directly to Fairview Hospital, where they "did a rape kit and vaginal exam . . . and STD testing." (Tr. 314-315.)

{¶ 10} At 2:33 a.m. on August 20, 2023, shortly after the incident and prior to her examination at Fairview Hospital, D.T. sent Harris an Instagram direct message that read:

> Okay. I'm not gonna lie to you . . . I left because you made me uncomfortable as hell and that's what's making me want to throw up. I literally woke up to you having sex with my passed out body, that is literally making me sick to my stomach I gave you no signs that I wanted to have sex.

(Tr. 318-319; State's exhibit No. 7.) Harris responded, writing:

> How ima suppose to kno you passed out you was moving[.] That never happened you could've told me to stop at any moment you didnt tho[.] That just showed I aint fu*kin with nobody thats drunk no more[.]

(Tr. 318; State's exhibit No. 7.) D.T. reminded Harris that he said he was sorry when she woke up, to which he replied that he thought he hurt her. (Tr. 318-319 and State's exhibit No. 7.) Harris continued sending direct messages to D.T. He pointed out that D.T. had asked him not to ejaculate inside her, posing the question: "[Y]ou couldn't say stop then?" (Tr. 319-320 and State's exhibit No. 8.) He followed up with six more messages before receiving a response from D.T. She replied that she had "made it known . . . that we could ONLY be friends and nothing more." (Tr. 321 and State's exhibit No. 10.) She explained that she woke up in shock because she "never said [she] wanted to have sex or even gave [Harris] a sign it was okay for [them] to have sex." (Tr. 321 and State's exhibit No. 10.) D.T. protested that she "was literally drunk as fu*k and went to sleep with my clothes on." (Tr. 321 and

State's exhibit No. 10.) She posed the rhetorical question: "[H]ow is that giving any sign that I want to have sex?" (Tr. 321 and State's exhibit No. 10.) She wrote that she "didn't want sex" and "didn't want any of this" and that her request that Harris not ejaculate inside her stemmed from a recent pregnancy scare. (Tr. 321-322 and State's exhibit No. 11.) She told Harris she did not want to converse with him further because she felt "violated and sick about it." (Tr. 322 and State's exhibit No. 11.)

{¶ 11} Harris continued to send messages asking D.T. if she was okay and indicating that he cared about her. D.T.'s final response, captured in a direct message, reads:

> You keep sending and sending — you keep sending and unsending messages. I seen you say you love me. I don't love you. Never have. Never even gave you the impression that I did. I told you that you were friends with my BD and that shit would never go anywhere. I told you I don't like the shit you did and it disgust me that you really had sex with my passed out body. You knew I was drunk. Knew I was really fu*king drunk and still had sex with an unconscious body. You can say whatever reason you said sorry but that shit is still sickening to me and violating. Leave me the fu*k alone. Stop calling me. Stop texting me. Stop sending and unsending messages. I don't need any notifications from you nor do I want them. I'm blocking you now.

(Tr. 324-325 and State's exhibit No. 13.)

{¶ 12} The State called three witnesses in addition to victim D.T. Rita Lovelace, a forensic registered SANE nurse for 13 years, testified regarding her examination of D.T. at Fairview Hospital.[2] She identified State's exhibit No. 1 as the report of her examination. The report indicated that D.T. arrived at Fairview Hospital's emergency department at 3:00 a.m. The examination, however, did not

---

[2] SANE is an acronym for Sexual Assault Nurse Examiner. (Tr. 259.)

take place until 9:00 a.m., some six hours after D.T.'s arrival. (Tr. 261-262.) While performing a history of the event for purposes of medical treatment, Lovelace documented D.T.'s description of the incident, which was read into testimony:

> Patient states around 2 a.m. I went over to a friend's (not sure of legal name) house because I was drunk and did not want to drive home. I went to bed fully dressed with a blanket on me. I woke up with him inside me (clarified by patient, his penis was inside my vagina.) I just laid there. I was confused. I was shocked. He said that he was about to cum and I said, Do not cum inside of me. I just got through a big health scare so he came on my left leg thigh. When he was done he laid down beside me. I got up and got dressed. I left his place and came to the hospital.

(Tr. 263-264.)

{¶ 13} The SANE report described D.T. as calm but tearful. (Tr. 264.) Lovelace described her examination in some detail, including the collection of DNA specimens. (Tr. 264.) Lovelace explained that at the time of the exam, six hours after D.T.'s arrival, she was observed to be "clinically sober" in the sense that she was sufficiently alert and oriented to consent to the SANE examination. (Tr. 265.) In other words, "she is clinically sober enough to answer the questions and to sign forms that she knows what she is doing." (Tr. 265.)

{¶ 14} The State's final witnesses were Brittney Svoboda and Detective Kevin P. Smith. Svoboda, a DNA analyst, testified to a match between the seminal material collected during the SANE examination and Harris. Detective Smith, who investigated the case, testified that he linked Harris to the direct-message screenshots and took a DNA sample from Harris. He also stated that he reviewed messages on Harris's phone to ensure there were no messages that D.T. may have

deleted. (Tr. 401.) Smith further testified that in his experience, it is common for sexual-assault victims to "freeze" during the assault itself. (Tr. 398-399.)

{¶ 15} At the conclusion of testimony, the State's exhibits were admitted and the State rested. Harris made a Crim.R. 29 motion for acquittal, which the trial court considered in great detail, repeatedly probing counsel for both the State and for Harris with respect to the circumstances surrounding the incident. It recessed for the day, spoke at length again on the record the next morning, and denied the motion. (Tr. 410-479.)

{¶ 16} Before the jury returned, the parties addressed various jury instructions, with Harris arguing that the trial court should include an instruction using "the definition of knowledge under [R.C.] 2901.22(B)." (Tr. 509.) The trial court expressed its preference for "the normal O[hio] J[ury] I[nstuctions]" ("OJI") rape instruction. (Tr. 509.) Reading from the OJI instruction for rape, the trial court noted that to find Harris guilty, the jury would have to find that he "knew or had reasonable cause to believe that the victim" was substantially impaired, and asked defense counsel, "Why wouldn't they know what that means?" (Tr. 511-512.) It rejected the proposed instruction as essentially "overcharg[ing]" or "over-instruct[ing]" the jury, stressing that the knowledge component in the OJI rape instruction did not require "further definition." (Tr. 512-515.)

{¶ 17} Harris rested without calling witnesses and renewed his Crim.R. 29 motion, which the trial court denied. Following closing arguments and the trial court's charge, the jury deliberated and returned a guilty verdict. The trial court

entered judgment in accordance with the verdict and sentenced Harris to an indefinite prison term of 9 to 13 and one-half years, postrelease control, lifetime sex offender registration, and a fine of $10,000, with $5,000 suspended.

## II. Assignments of Error

{¶ 18} Appellant presents four assignments of error for our review:

**ASSIGNMENT OF ERROR I:**
The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A) as to Count One of the indictment, and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of Mr. Harris's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution, as well as Article I, Section 16 of the Ohio Constitution.

**ASSIGNMENT OF ERROR II:**
The trial court erred by entering judgments of conviction as to Count One of the indictment that were against the manifest weight of the evidence, in derogation of Mr. Harris's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

**ASSIGNMENT OF ERROR III:**
The trial court abused its discretion in refusing to instruct the jury as to the definition of the culpable mental state required to commit the crime of rape.

**ASSIGNMENT OF ERROR IV:**
The trial court erred by sanctioning Mr. Harris with a fine of $5,000.00.

{¶ 19} We find no merit to Harris's assignments of error. Accordingly, we affirm Harris's conviction, as well as the trial court's imposition of the challenged monetary sanction.

## III. Analysis

### A. Sufficiency of the Evidence

{¶ 20} In his first assignment of error, Harris argues there was insufficient evidence to support his conviction for substantial impairment rape and that the trial

court therefore erred in denying his Crim.R. 29 motions for acquittal. We have recently reaffirmed that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Spencer*, 2024-Ohio-5809, ¶ 15 (8th Dist.), citing *State v. Murphy*, 2001-Ohio-112; *State v. Williams*, 2025-Ohio-2593, ¶ 26 (8th Dist.); *State v. Lynch*, 2025-Ohio-2769, ¶ 49 (8th Dist.). The appellate court views the evidence "'in a light most favorable to the prosecution'" to determine whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Spencer* at ¶ 15, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *Williams* at ¶ 26. The inquiry is whether the State has met its "burden of production" at trial. *State v. Dyer*, 2007-Ohio-1704, ¶ 24 (8th Dist.); *Lynch* at ¶ 49.

{¶ 21} "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Cleveland v. Williams*, 2024-Ohio-3102, ¶ 10 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *see also Cleveland v. Neal*, 2024-Ohio-1467, ¶ 26 (8th Dist.); *Lynch* at ¶ 49. Appellate courts are not to assess "whether the State's evidence *is to be believed*, but whether, *if believed*, the evidence against a defendant would support a conviction." (Emphasis added.) *Dyer* at ¶ 24; *Lynch* at ¶ 49. In considering the sufficiency of the evidence, we do not independently weigh the evidence, because

"the evaluation of the weight of the evidence and credibility of witnesses are jury issues." *State v. Hill*, 75 Ohio St.3d 195, 205 (1996). *See also State v. Mitchell*, 2007-Ohio-3896, ¶ 35 (8th Dist.); *State v. Agee*, 2013-Ohio-5382, ¶ 95 (7th Dist.) ("[C]redibility is generally the province of the jury who sits in the best position to assess the weight of the evidence and credibility of the witnesses whose gestures, voice inflections, and demeanor are personally observed.").

{¶ 22} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *Lynch* at ¶ 50, quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988); *Jenks* at 272.

{¶ 23} Under R.C. 2907.02(A)(1)(c), substantial impairment rape occurs when a victim's "ability to resist or consent is substantially impaired because of a mental or physical condition . . . and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition." The issues here are whether the State produced sufficient evidence regarding the element of the victim's substantial impairment and whether Harris knew or had reasonable cause to know of her impaired condition.

{¶ 24} "'Substantially impaired' is not defined in the statute. Therefore, 'the term must be given the meaning generally understood in common usage.'" *State v. Palmer-Tesema*, 2020-Ohio-4291, ¶ 9 (8th Dist.), quoting *State v. Zeh*, 31 Ohio St.3d 99, 103 (1987). The State "can show substantial impairment by offering

evidence 'demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct.'" *Palmer-Tesema* at ¶ 9, quoting *Zeh* at 103-104. "Voluntary intoxication is a mental or physical condition that could cause substantial impairment." *State v. Jones*, 2015-Ohio-1818, ¶ 43 (8th Dist.), citing *State v. Doss*, 2008-Ohio-449, ¶ 13 (8th Dist.). "The victim's own testimony may be sufficient to establish substantial impairment." *Palmer-Tesema* at ¶ 10, citing *State v. Foster*, 2020-Ohio-1379, ¶ 45 (8th Dist.). Indeed, Ohio courts "consistently hold that a victim's testimony alone is sufficient to support a rape conviction." *State v. Smith*, 2023-Ohio-1670, ¶ 19 (8th Dist.), citing *State v. Roan*, 2020-Ohio-5179, ¶ 21 (8th Dist.), citing *State v. Blankenship*, 2001 Ohio App. LEXIS 5520, *11 (8th Dist. Dec. 13, 2001). "'[T]here is no requirement that a rape victim's testimony be corroborated precedent to conviction.'" *Smith* at ¶ 20, quoting *Roan* at ¶ 21.

{¶ 25} "This court has held that sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct." *State v. Clark*, 2008-Ohio-3358, ¶ 21 (8th Dist.), citing *State v. Graves*, 2007-Ohio-5430, ¶ 22 (8th Dist.); *State v. Keller*, 2018-Ohio-4107, ¶ 25 (8th Dist.); *State v. McCall*, 2017-Ohio-296, ¶ 6 (8th Dist.); *State v. Jones*, 2012-Ohio-5737, ¶ 30 (8th Dist.). "When a person is asleep, he or she is not in a mental condition to resist or consent to the sexual conduct." *Clark* at ¶ 21.

{¶ 26} Here, D.T. testified that she never consented to sexual activity with Harris and that after consuming several alcoholic beverages, she fell asleep and

awoke to find Harris on top of her, with his penis already inserted into her vagina. In *Smith*, this court held that where the victim "testified that she was intoxicated, asleep, and awoke to Smith engaging in sexual conduct with her[,] this testimony alone is sufficient to prove a violation of R.C. 2907.02(A)(1)(c)." *Smith* at ¶ 21.

{¶ 27} Even more on point is *Roan*, 2020-Ohio-5179 (8th Dist.). In *Roan*, as here, the intoxicated victim "testified that she was asleep and woke up to [the defendant] penetrating her with his penis while lying on top of her." *Id.* at ¶ 21. This court held that the victim's testimony alone could "provide sufficient evidence of substantial impairment rape pursuant to R.C. 2907.02(A)(1)(c)." *Id.* It stressed that in reviewing "whether a conviction is supported by sufficient evidence, we look to whether the state presented sufficient evidence, not whether that evidence was rebutted by the defense." *Id.* This court ultimately held that based upon the victim's "testimony that Roan penetrated her vagina while she was sleeping, we find sufficient evidence to convict Roan of substantial impairment rape in violation of R.C. 2907.02(A)(1)(c)."

{¶ 28} With respect to knowledge of a victim's impairment, this court has stated that "[e]vidence that should have alerted an offender to whether a victim was substantially impaired may include evidence that the victim was stumbling, falling, slurring speech, *passing out*, or vomiting." (Emphasis added.) *Keller*, 2018-Ohio-4107, at ¶ 31. In her testimony, which tracked her direct messages to Harris after the incident, D.T. described waking up to Harris with his penis inside her "passed out body." Even more to the point, this court had held that "[a]n ordinary person

would 'know or have reasonable cause to believe' that a person who is sleeping is unable to resist or consent." *State v. Davis*, 2018-Ohio-841, ¶ 53 (8th Dist.), quoting R.C. 2907.02(A)(1)(c).

{¶ 29} *State v. Schmidt*, 2007-Ohio-4439 (8th Dist.), is distinguishable. While the victim in that case testified that she did not consent to vaginal intercourse, she also testified that she was in and out of consciousness during the encounter, and — most importantly — "that she repeatedly continued to engage in very intimate consensual sexual activity with defendant" short of vaginal intercourse. *Id.* at ¶ 46. Because the victim in *Schmidt* consented to several sex acts, the court questioned the defendant's knowledge of her claimed impairment. D.T., by contrast, consistently testified that she had consented to no sexual activity whatsoever. *Compare Keller* at ¶ 29 (8th Dist.) ("[U]nlike in *Schmidt*, the victim testified that she remembered the entirety of the evening prior to passing out; however, she did not consent to *any* sexual contact or conduct with the defendant. Instead, the victim awoke to Keller digitally penetrating her and then discovered that he had had sexual intercourse with her."). In *Keller*, this court also distinguished *Doss*, 2008-Ohio-449 (8th Dist.), on the issue of the defendant's knowledge, noting that "unlike in *Doss*, there was no indication prior to the sexual conduct that would have led Keller to believe that the victim was consenting to sexual activity," and also that "the victim in *Doss* did not have any recollection of the sexual encounter, whereas the victim in

this case testified that she fell asleep and awoke to Keller digitally penetrating her." *Id.* at ¶ 34.[3]

{¶ 30} Pursuant to *Roan*, *Smith*, *Keller*, *Davis*, and the additional cases cited above, D.T.'s testimony was sufficient to support Harris's conviction for substantial impairment rape. Harris's first assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶ 31} In his second assignment of error, Harris argues that his conviction was against the manifest weight of the evidence. "In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion." *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.); *State v. Shirley*, 2025-Ohio-1064, ¶ 21 (8th Dist.). In our manifest-weight analysis, we "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact *clearly lost its way* and *created such a miscarriage of justice* that the conviction must be reversed and a new trial ordered." (Emphasis added.) *Spencer*, 2024-Ohio-5809, at ¶ 26 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d at 387.

---

[3] *State v. McClain*, 2025-Ohio-962 (8th Dist.), is likewise distinguishable. In *McClain*, the alleged victim could not recall any sexual activity with the defendant. Here, by contrast, D.T. herself testified as to her state at the time of the sexual conduct, i.e., that she passed out and awoke fully clothed, with her garments disturbed (but not removed) below the waist, to find Harris already on top of her and with his penis inside her. (On August 5, 2025, the Ohio Supreme Court accepted *McClain* on discretionary appeal. *State v. McClain,* 2025-Ohio-2749.)

{¶ 32} An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387; *Williams*, 2025-Ohio-2593, at ¶ 41 (8th Dist.). This is because "in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact." *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.); *see also Cleveland v. Johns,* 2024-Ohio-3301, ¶ 24 (8th Dist.). Indeed, an appellate court "'may not substitute its own judgment for that of the finder of fact.'" *Id.* at ¶ 24, quoting *State v. Harris*, 2021-Ohio-856, ¶ 33 (8th Dist.).

{¶ 33} As discussed more fully above, D.T. testified that she never gave Harris any indication that she wanted either sex or a romantic relationship with him, a claim corroborated by the earlier direct-message exchanges between her and Harris. She testified that she had several drinks on the night of the incident and that before meeting Harris at a bar, she told him she was drunk. D.T. testified that she awoke to find Harris already penetrating her clothed but "passed out body" with his penis. She sought immediate medical treatment at Fairview Hospital. When she confronted Harris by direct message, reminding him that she "gave [him] no signs that [she] wanted to have sex," he did not deny it. His response, instead, was to say he did not know she was passed out because she "was moving" while he penetrated her — not communicating in any meaningful fashion, but merely "moving." Harris also wrote that he would not be "fu*kin wit nobody thats drunk no more," acknowledging that D.T. had been intoxicated.

{¶ 34} Harris did not claim in his direct messages that D.T. gave any signal, at any point — either verbally or physically — that she consented to sex. Indeed, D.T. pointed out that when she woke up, he said, "I'm sorry." She sent a direct message reminding Harris that she had previously told him "we could ONLY be friends and nothing more" and that she "was literally drunk as fu*k and went to sleep with [her] clothes on." She asked, "[H]ow is that giving any sign that I want to have sex?" Harris's response, also by direct message, was to say, "So watchu wanna do how can we move on from this and fix this" and "You alright over there?" He did not challenge D.T.'s remarks concerning her drunkenness, her unconsciousness, her clothed state, or her statement that she never wanted sex with him and never gave him a cue that she wanted sex.

{¶ 35} The defense cross-examined D.T. regarding her reaction upon awakening and also pointed to apparently minor discrepancies between D.T.'s testimony and the report prepared by the SANE nurse that, on the whole, was consistent with D.T.'s testimony and the direct-message exchanges. In his string of direct messages, for example, Harris wrote: "You told me dont cum in you you couldn't say stop then?" Harris seemed to imply that upon awakening to find he was already penetrating her, D.T. consented to continued intercourse by asking him to ejaculate externally rather than demanding he stop. The jury was free to reject that implication based on D.T.'s testimony alone. She consistently testified that she had no interest in sex with Harris, never consented to sex with him, was intoxicated, and awoke to find Harris on top of her having vaginal intercourse, after which she "was

in shock," she "froze," and she was panicked over possibly becoming pregnant. Her direct message and testimony reflect that she told Harris not to ejaculate inside her "because [she] didn't want sex."

{¶ 36} D.T. testified she was passed out when Harris began having sex with her. A rational jury, accepting that testimony, could reasonably conclude that nothing D.T. said upon awakening changed that fact; the crime of substantial impairment rape had already occurred. Moreover, these were all credibility issues for the jury. As we wrote in *Johns*, "'[t]he weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact'" and "[t]he trier of fact may 'believe or disbelieve any witness or accept part of what a witness says and reject the rest.'" *Johns*, 2024-Ohio-3301, at ¶ 24 (8th Dist.), quoting *Metz*, 2019-Ohio-4054, at ¶ 70 (8th Dist.).

{¶ 37} On this record, we cannot conclude that this is the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. Harris's second assignment of error is overruled.

## C. Harris's Proposed Jury Instruction

{¶ 38} In his third assignment of error, Harris contends that the trial court abused its discretion in refusing to instruct the jury as to the definition of the culpable mental state required to commit the crime of substantial impairment rape. The trial court here gave the standard OJI instruction for rape, 2 *Ohio Jury Instructions*, CR § 507.02(A)(1) (Rev. Jan. 22, 2011), refusing Harris's request for

an additional instruction defining the term "knowingly" based upon R.C. 2901.22(B) and presumably drawn from 2 *Ohio Jury Instructions*, CR § 417.11.

{¶ 39} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240. Harris cites *State v. Barron*, 170 Ohio St. 267 (1960), for the proposition that "if requested special instructions, reduced to writing, are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge." *Id.* at syllabus. The Ohio Supreme Court repeated that holding in *Cincinnati v. Epperson*, 20 Ohio St.2d 59 (1969), paragraph one of the syllabus. In a 2014 decision citing *Epperson* for that proposition, however, the Court warned that "it is clear that there must be a limit. No purpose is served, for instance, by requiring courts to present redundant jury instructions or instructions that are so similar to other instructions to be presented as to be confusing." *State v. Griffin*, 2014-Ohio-4767, ¶ 5.

{¶ 40} The ultimate decision whether to give an instruction is committed to the trial court's sound discretion. "An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *Adams* at ¶ 240, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). The trial court gave the standard OJI instruction for the offense of rape. "The Ohio Jury Instructions are not authoritative, but are 'helpful' as a 'generally accepted interpretation' of a statute."

*State v. James*, 2015-Ohio-4987, ¶ 33 (8th Dist.), quoting *State v. Gardner*, 2008-Ohio-2787, ¶ 97 (Lanzinger, J., dissenting).

{¶ 41} Harris's argument aligns with certain arguments made in *State v. Virostek*, 2022-Ohio-1397 (8th Dist.), in which a jury found the defendant guilty of substantial impairment rape. While Virostek's jury-instruction challenge involved a plain-error analysis, the procedural facts and holding are highly instructive. Like the present case, the trial court's instruction tracked the OJI rape instruction, including language indicating that to find Virostek guilty of rape, the jury "must find beyond a reasonable doubt that . . . Virostek *knew or had reasonable cause to believe* that [the victim's] ability to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age." (Emphasis added.) *Id.* at ¶ 68. Virostek's argument centered on alleged confusion or omission concerning the mens rea element of "knowingly." *Id.* at ¶ 67. This court rejected his argument, holding:

> The Supreme Court of Ohio has recognized that "terms of common usage need not be defined for the jury." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 106, citing *State v. Riggins*, 35 Ohio App.3d 1, 8, 519 N.E.2d 397 (8th Dist.1986). Thus, if the undefined term is one of common usage and is used in the jury instruction in that sense, the failure to define the term does not mandate reversal. *State v. Watkins*, 10th Dist. Franklin No. 01AP-1376, 2002-Ohio-5080, ¶ 39, citing *Riggins* at *id.* Moreover, where there is sufficient evidence upon which a jury could reasonably conclude that all the elements of the offense have been proven beyond a reasonable doubt, the failure to define a term is harmless error. *Watkins* at *id.*
>
> We find nothing in this case that would mandate reversal due to the trial court's failure to define "knew or had reasonable cause to believe" for the jury. The language was used in the jury instruction in the

common sense. The jury apparently understood the terms used; it did not request clarification or definition, and appellant does not explain what incorrect meanings the jury could have attributed to "knew or had reasonable cause to believe."

*Id.* at ¶ 70-71. *See also State v. Colonel*, 2023-Ohio-3945, ¶ 4 (4th Dist.) ("We find that 'know or have reasonable cause to believe' is not a technical phrase nor does it have a meaning not generally understood by the average juror. The trial court instructed the jury on all elements that must be proved to establish the crimes and it did not err when it did not define a common-sense phrase.").

{¶ 42} Here, we find no abuse of discretion in the trial court's decision not to give an additional instruction. The OJI rape instruction is both complete and correct; it included all elements of the charge. "Knew or had reasonable cause to believe," as contained in the standard OJI rape instruction, consists of terms of common usage employed in their common sense. Furthermore, there is nothing in the record to indicate that the jury struggled with these common terms, such as a jury question related to mens rea. Harris's third assignment of error is overruled.

## D. The Trial Court's Imposition of a $5,000 Fine

{¶ 43} In his fourth assignment of error, Harris contends that the trial court erred by sanctioning him with a fine of $5,000. He cites R.C. 2929.19(B)(5), which provides:

> Before imposing a financial sanction under section 2929.18 of the Revised Code or a fine under section 2929.32 of the Revised Code, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine.

{¶ 44} The sentencing transcript reflects that the trial court reviewed the presentence-investigation report and considered Harris's present and future ability to pay. The trial court indicated on the record that it "[saw] no economic means in this report" and that Harris "had minimal employment and income." (Tr. 643.) It stated that Harris was "going to have a long time in prison," that he could work towards paying the fine "while in prison," and that "it would be to his benefit and credit to do so while in prison." (Tr. 643-644.)

{¶ 45} Harris contends that under the Ohio Administrative Code schedules for prisoner pay, he could not possibly pay the fine during his prison term even if he fell into the "high skill" category and worked in prison continuously. This court, however, has stated that "[w]hile the statute requires the court to consider the defendant's present and future ability to pay the fine, 'there are no express factors that must be taken into consideration or findings regarding the offender's ability to pay that must be made on the record.'" *State v. Cotto*, 2019-Ohio-985, ¶ 11 (8th Dist.), quoting *State v. Hampton*, 2016-Ohio-5419, ¶ 7 (8th Dist.). Furthermore, "a trial court satisfies this requirement when it considers a presentence investigation report that contains information about the defendant's financial situation and his ability to pay the fine[,]" and "[u]ltimately, to avoid the imposition of a mandatory fine, the burden is on the defendant 'to affirmatively demonstrate that he or she is indigent and is unable to pay the mandatory fine.'" *State v. Debose*, 2022-Ohio-837, ¶ 32 (8th Dist.), quoting *State v. Gipson*, 80 Ohio St.3d 626, 635 (1998).

{¶ 46} As noted above, the trial court specifically referenced the presentence-investigation report, indicating that the report contained information regarding Harris's financial situation and ability to pay the fine. It was not required to reference express factors or make further findings on the record. The trial court met its obligation under the statute. Furthermore, while Harris protests that he will be unable to pay the entirety of the fine while imprisoned, this demonstrates nothing regarding his earning capacity upon release. *See, e.g., Cotto* at ¶ 13 (defendant failed to meet burden for avoiding mandatory fine where he argued it would be difficult to find employment upon release from prison because of his mental illness and criminal record).

{¶ 47} Harris's fourth assignment of error is overruled.

{¶ 48} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EILEEN T. GALLAGHER, J., CONCUR